UNITED STATES of America, Plaintiff-Appellee,

v.

Nathaniel Lewis WILLIAMS, a/k/a Nate Williams, and Lewis Albert Watson, Jr., a/k/a Curtis Williams, Defendants-Appellants.

No. 78–5290.

United States Court of Appeals, Fifth Circuit.

April 10, 1979.

Charles B. Lembcke, Jacksonville, Fla. (Court-appointed), for Williams.

Douglas P. McClurg, Jacksonville, Fla. (Court-appointed), for Watson.

Douglas J. Titus, Jr., Asst. U. S. Atty., John L. Briggs, U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GEWIN, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

Appellant Nathaniel Lewis Williams was found guilty under a two count indictment charging that on or about January 18, 1978

he and two others, Lewis Albert Watson and Oscar English, Jr., robbed the Sun First National Bank, Eustis, Florida in violation of 18 U.S.C. §§ 2113(a) and 2113(d). Watson was found guilty only on count one of the indictment. English pled guilty to count one of the indictment and was sentenced to ten years pursuant to a plea agreement. Williams received a sentence of twenty-five years incarceration and Watson received a sentence of ten years. Both Williams and Watson appeal their convictions.

## FACTS

On January 18, 1978 at approximately 1:00 p. m., the Sun First National Bank of Leesburg, Eustis Plaza Office was robbed by a black man wearing a dark stocking cap with a white band around it and dark sunglasses. When the robber first approached the teller, Cynthia Braswell, and announced that he was robbing the bank, Braswell panicked, screamed and ran to a nearby storage room where she locked herself. Another teller, Marie Franks, approached the robber who showed her the revolver and instructed her to give him the money. On his way out of the bank the robber passed a customer, Theron Howard. The bank surveillance cameras took several photographs of the robber.

Charles Adcock, the bank's manager and Paul Weicherz, another teller, sat talking approximately twenty feet from where the robbery took place. Adcock realized what was taking place and was able to switch on the cameras which photographed the robber. An audit conducted immediately after the robbery revealed that $5687.78 was taken during the robbery.

Outside the bank, two automobile salesmen observed a 1967 to 1969 light blue, four-door Buick Skylark or Oldsmobile parked near the bank with two black males inside. They observed another male run up to and enter the car. One of the three males then got out of the car and pushed it away from the sand where it had gotten stuck.

Catherine Smith testified that she was a friend of Williams and that on January 18, 1978 she loaned Williams her car, a 1969 blue Oldsmobile. Smith further testified that Williams returned her car around 4:30 or 5:00 that evening.

Oscar English testified that on the day of the robbery he was picked up by Williams at Diane Ingram's apartment. Ingram testified that English was picked up by Williams at her apartment early one morning around the middle of January. Ingram and her cousin, Charlene Brown, testified that on that same day English came back to Ingram's apartment where they helped him count about $1,500 in cash.

English testified that after Williams picked him up on January 18, 1978 in Smith's blue Oldsmobile, they picked up Lewis Watson and drove to Eustis, Florida looking for a Flagship Bank which they planned to rob. When they were unable to find the Flagship Bank they instead decided to rob the Sun First National Bank. English stated at trial that the three of them purchased some lemons to "throw the camera off" and they left Williams off at the bank. English said that after the robbery he pushed the automobile away from the soft sand and that he lost a pack of Benson and Hedges (later found by police) while pushing the car. English stated that the three men returned to Watson's girlfriend's apartment to divide the money. Janice Hamilton, Watson's girlfriend, testified that around the middle of January, 1978, Williams, Watson and a third individual came by her apartment, went into the bedroom and closed the door. Hamilton stated that the next night she saw Watson counting $500. When shown a photograph of English she identified him as the third person who had accompanied Williams and Watson into her apartment.

At trial, tellers Franks and Braswell, bank manager Adcock and witness Howard identified Williams as the robber. English identified both Williams and Watson as his accomplices.

Before the trial, an FBI agent, Donald Dowd, displayed individually to the four

**1280**

bank employees two photographic spreads containing six photographs each. Williams' picture was the fourth photograph in each spread. Franks identified Williams as the robber in the first group of photographs but was unable to select anyone from the second group. Adcock selected the fourth photograph from both groups. Braswell selected the fourth photograph from each group as most resembling the bank robber. Weicherz was not able to select any photograph as depicting the bank robber. Witness Howard was shown a different photographic spread from the one shown to the bank employees. Howard selected Williams' picture as that of the bank robber.

Williams argued to the trial court that the photographic identification procedure was suggestive and filed a motion to suppress. The trial court held at the suppression hearing that there was nothing suggestive about the identification procedure used by the FBI agent. The trial court did not allow any testimony at the suppression hearing other than that of the FBI agent who conducted the identification procedure.

Following a court-ordered lineup, Howard and Adcock selected Williams as the bank robber. Franks and Braswell selected someone other than Williams. Counsel for Williams was not permitted by the government to interview the witnesses after the lineup although the witnesses were taken away after each identification to be interviewed by the FBI agents.

Both Williams and Watson denied any involvement in the bank robbery. Appellants testified at trial establishing an alibi for each other.

## I. SUGGESTIVENESS OF IDENTIFICATION PROCEDURE

■ Appellant Williams complains that the photographic identification procedure used by the government was impermissibly suggestive. See *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *United States v. Sutherland*, 428 F.2d 1152 (5th Cir. 1970) this Court enumerated a procedure which trial courts could follow to avoid irreparable misidentification in court.

Prior to offering the in-court identification before the jury, the trial judge should be accorded an opportunity out of the presence of the jury to determine if the picture spread in the particular case was impermissibly suggestive either in the photographs used or the number of times they are displayed.

428 F.2d at 1155. If the trial judge determines that the photographic spread is impermissibly suggestive then he must consider the second prong—whether this suggestiveness gives rise to a likelihood of in-court misidentification. However, if the judge does not find both that the photographic spread was impermissibly suggestive and that there is a substantial likelihood of irreparable misidentification in court, the in-court identification may be put to the jury. See *United States v. Henderson*, 489 F.2d 802, 805 (5th Cir. 1973).

■ In the case before us appellant filed a motion to suppress alleging the photographic spread was suggestive. At the suppression hearing, the trial judge did not permit appellant to present witnesses to support his allegations. Rather, the trial judge based his finding that the photographic spread was not suggestive on the sole testimony of the FBI agent, the government's witness. After hearing some evidence at trial regarding the suggestiveness of the photographic spread, namely that Williams was the only person common to both sets of photoghraphic spreads shown identification witnesses and that his picture was different from that of the other subjects, the trial judge did not re-examine his ruling on the motion to suppress. Thus, the denial of the motion to suppress was not based upon a fair interpretation of all the evidence but was based entirely on the testimony of the government's witness. We need not decide whether the in-court identification was tainted since the determination of whether the photographic spread was impermissibly suggestive must precede any decision regarding the in-court identification.

Appellant further argued at the suppression hearing that the line-up identification was suggestive. Again, the trial judge allowed no testimony by the identification witnesses regarding the suggestiveness of the line-up. The same bipartite inquiry enumerated above regarding photographic spreads is applicable to other types of confrontation procedures such as the line-up. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Allen v. Estelle*, 568 F.2d 1108 (5th Cir. 1978). As was the case with the photographic spread procedure, the trial court failed to make a determination, based upon all the evidence, on the suggestiveness of the line-up. Instead, the trial court made its determination based on the testimony of the government's witness without allowing the appellant an opportunity to call witnesses who may have testified in his favor. The Supreme Court in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1966) recognized that there is a high incidence of miscarriage of justice resulting from suggestive presentation of a suspect in a pre-trial line-up identification. Although appellant's counsel was present during the line-up, the effectiveness of his presence was substantially undermined by not being allowed to show at the suppression hearing that the line-up was suggestive. Suppression hearings have little or no value unless the moving party is given wide latitude to develop the factual circumstances. This was not done here.

## II. RESTRICTION ON CROSS-EXAMINATION OF KEY WITNESS

One of the government's key witnesses was Oscar English who testified that Williams was the individual who robbed the Eustis Bank and who was the only witness to directly link Lewis Watson to the bank robbery. Both appellants attempted to establish, through cross-examination, English's bias and motive for testifying against appellants.

The Sixth Amendment to the Constitution guarantees to the accused in a criminal prosecution the right to be confronted with the witnesses against him.

Confrontation means more than being allowed to confront the witness physically. "Our cases construing the [confrontation] clause held that a primary interest secured by it is the right of cross-examination."

*Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) [citations omitted]. The Supreme Court in *Davis v. Alaska*, while recognizing the trial judge's discretion in precluding repetitive and unduly harassing interrogation, stressed the importance of the right of cross-examination to delve into a witness' story, to test the witness' perceptions and memory and also to impeach the witness.

In the case before us appellants were entitled to show English's bias. During a proffer of English's testimony it appeared that English may have volunteered to confess on the condition that the government help his brother and his girlfriend. There was also some evidence during the proffer that English had at other times been an informant. Appellants were not permitted to cross-examine English to show his bias. Cross-examination of a witness in matters relevant to credibility ought to be given wide scope. "It is especially important in a case where a witness or an accomplice may have substantial reason to cooperate with a government that a defendant be permitted to search for an agreement between the government and the witness." *United States v. Crumley*, 565 F.2d 945 (5th Cir. 1978). The trial judge erred in not permitting appellants full cross-examination of English on his alleged-request to the agents that his brother and girlfriend be left alone in exchange for his testimony against appellants.

## III. FDIC COVERAGE

Appellants argue that the government did not prove that the bank of Eustis was a federally insured institution. Proof that the institution robbed was federally insured

was an essential element of the crime charged and had to be proved in order to establish federal jurisdiction. There was testimony from two bank officers who were called by the government for the purpose of proving that the deposits of the Sun First National Bank of Leesburg, Eustis Plaza Office were insured by the Federal Deposit Insurance Corp. (FDIC). One officer, Charles Edward Adcock, Jr., testified that the deposits of the Sun First National Bank of Leesburg were insured by the FDIC and that the Eustis Plaza Office is a branch office of the Sun First National Bank of Leesburg.[1] On cross-examination Adcock testified that he had never seen the FDIC insurance contract and that he did not know whether the insurance premiums had been paid.

Another bank officer, Donald G. Jones, senior vice-president of the Sun First National Bank of Leesburg, also testified concerning the matter of insurance coverage. Jones stated that he was responsible for paying the insurance premiums to FDIC and that the deposits of the Sun First National Bank of Leesburg were insured by the FDIC. He testified that all the branch offices of the bank were similarly insured and that a separate FDIC certificate did not exist for the Eustis branch office. He stated during cross-examination that he did not know if the insurance contract between the Sun First National Bank of Leesburg and the FDIC specifically provided for coverage of the branch banks.

 Although the proof of FDIC insurability by the government was probably close to the minimum we could allow, there was sufficient evidence from which the jury could reasonably infer that the Eustis Branch office was federally insured. *See United States v. Fitzpatrick*, 581 F.2d 1221 (5th Cir. 1978).

## CONCLUSION

Because we are reversing and remanding for a new trial based on the restrictions placed on defense counsel during cross-examination of English and based on the refusal by the trial court to allow proof of the suggestiveness of the identification procedures, we need not consider the remaining issues raised as error by appellants.

REVERSED and REMANDED.

---

1. During Adcock's testimony a certificate stating that the Sun First National Bank of Leesburg was covered by FDIC was introduced at trial. Defense counsel objected on the grounds of hearsay, improper predicate for introduction and relevancy. The trial judge overruled these objections.