CARL E. REESE a/k/a Carl Montgomery *v.* STATE OF MARYLAND

[No. 798, September Term, 1982.]

*Decided April 11, 1983.*

The cause was argued before LOWE and WILNER, JJ., and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals (retired), specially assigned.

*David P. Sutton, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Kurt L. Schmoke, State's Attorney for Baltimore City,* and *Sandra Kemick, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

While on his way home from a neighborhood store, twenty-year-old Donald Major was suddenly and incomprehensibly assaulted and robbed by appellant (who had been his friend during the previous year) and an associate named William McClain. While appellant and McClain were walking ahead of Major, McClain struck him in the face with a nunchaku (two sticks joined by a chain) and appellant pointed a .38 caliber pistol at him demanding his watch. When he fell to the ground he was again struck with the nunchaku and ordered by appellant to remove his jacket. In all, the two took from him his watch, jacket, shoes and about $9.00, which they offered to return to him if he would fight McClain.

Apparently declining that opportunity, appellant then gave him two minutes to run home or be shot and, as he was preparing to depart, the threat was punctuated by appellant's firing the pistol in the air. As the victim ran toward home and to the police, the assailants fled the scene in the opposite direction. The officer to whom Major immediately reported the incident took him to the hospital after unsuccessfully seeking appellant at his home.

Upon this testimony of Donald Major, a jury in the Criminal Court of Baltimore convicted appellant of robbery with a deadly weapon, despite his explanation that it was McClain who had occasioned and consummated the entire episode. Although he admitted taking the personal effects McClain had freed from the victim and "set it on the side"; he denied carrying a gun or touching the victim, but his

explanation for having "set . . . [a]side" the victim's property was somewhat less than convincing to the jury which convicted him of robbery. The jury must have been convinced, however, that the degree of participation by appellant as recited by Major was overstated, since it acquitted him of the use of a handgun in the commission of a crime of violence. It is the victim's credibility that is at issue in this appeal.

Before, during and after the trial appellant sought leave to probe the psychiatric history of the victim and to cross-examine him regarding related matters. When the issue was raised *in limine* prior to trial, appellant's knowledge and consequent proffer was rather limited to hearsay knowledge that the victim had been a patient receiving treatment at Springfield State Hospital. The court declined to permit the inquiry on that limited proffer but agreed to reconsider the matter upon the availability of additional psychiatric information. In fact, the court directed its staff to contact the Medical Administrator of the Supreme Bench of Baltimore, Mr. Conti, and obtain "some information from the files of the hospital".

Following Mr. Major's testimony during the trial, the court recessed to meet with Mr. Conti who informed the court that Major had been admitted to Springfield State Hospital "at least twelve times in the last several years," the most recent having been since the robbery but prior to trial. Relating what he had obtained from the record the Medical Administrator indicated that Mr. Major's diagnosis was "mixed emotional disturbance and borderline personality," which was described by Mr. Conti.

> "Essentially a borderline personality individual is someone who experiences from time to time under stress episodes of psychosis or losing touch with reality and comes back into reality fairly easily."

Mr. Conti added that he was not able to state that these precise symptoms applied specifically to the victim but, he added, that

"if he had been out of touch with reality at the time of the offense he would not be able to recollect issues in any kind of detail."

Mr. Conti volunteered the observation on the other hand, that a courtroom appearance "is a tremendous amount of stress for anybody" and apparently Mr. Major had held up thus far in trial.

The judge decided that:

"From the limited information that we have from Mr. Conti from the hospital records I don't think there is sufficient information at this time to permit an interrogation of the witness on that basis and I don't think it is practical to continue the case over at this point."

He did suggest to appellant's counsel, however, that:

"Perhaps if the Jury finds your man guilty you could get some information and incorporate it in a motion for a new trial or a motion to strike or something."

The trial was then resumed without the jurors having any knowledge of this key witness's psychological propensities or psychiatric problems. They convicted appellant on Major's testimony.

Accepting the judge's recommendations, appellant subpoenaed the Springfield State Hospital's medical records, the contents of which formed the basis of his motion for a new trial. In addition to revealing that Mr. Major was readmitted to the hospital six days after the trial, counsel proffered that

"the hospital records indicate that on the April 29, 1982 report that Dr. Parks states the patient has a long history of drug abuse and frequent psychotic episodes and then on an earlier admission in 1981 — June 1, 1981 — they found that when the patient, Mr. Major, was on the ward 'he is psychotic with bizarre, confused and agitated behavior' —

\* \* \*

This is now June 1, 1981 where they say that 'on the ward he is psychotic with bizarre, confused and agitated behavior such as running up and down the hallway, banging on the door, standing in the corner of the room, touching walls, running fingers along the corner and talking to himself when there is nobody around. They also diagnosed him as being schizophrenic.

I would submit that had the Jury been aware of the fact that he has had twelve hospitalizations at Springfield and that his behavior there was irregular it may have been a factor to weigh in deciding on the credibility of the victim and I would also point out that the only witness called by the State as to the facts surrounding this incident was, of course, Mr. Major himself. So, I would submit that his credibility was crucial for the Jury to determine whether or not the State had made out a case.

The crucial issue seems to turn upon at what point the judge's discretion totally to restrict credibility cross-examination of a witness begins and ends. In a different but somewhat related sense, that issue revealed a considerable difference of opinion in this Court in *Cox v. State,* 51 Md. App. 271 (1982), which the Court of Appeals has consented to clarify by granting the State's petition for certiorari.

The federal appellate courts have repeatedly held that " 'this discretionary authority . . . comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment.' " *Greene v. Wainwright,* 634 F.2d 272, 275 (5th Cir. 1981), quoting *United States v. Bass,* 490 F.2d 846, 858, n. 12 (5th Cir. 1974). This seems to be predicated upon the statement in *Alford v. United States,* 282 U.S. 687, 691 (1931), that "it is the essence of a fair trial that reasonable latitude be given

the cross examiner;" and the importance of the Sixth Amendment right to cross-examine for purposes of impeaching or discrediting a witness was interpreted in *United States v. Williams,* 592 F.2d 1277, 1281 (5th Cir. 1979), as requiring a particularly wide scope on matters relevant to credibility. More recently (February 22, 1983) and even more appropriately the United States Court of Appeals for the Eleventh Circuit decided that the high degree of relevance of the witness's mental condition to the issue of her credibility required the trial court to permit a broad-ranging cross-examination of the witness by the defense and to deny it was an abuse of discretion. *United States v. Lindstrom,* 32 Crim. L. Rep. 2485 (1983). While that may very well be an appropriate ruling in Maryland, in the case at bar we need not go quite that far.

The parties are in agreement upon certain basic concepts that help narrow the issue: *i.e.,* that the scope of cross-examination is within the discretion of the court, *Conner v. State,* 34 Md. App. 124, 133 (1976); that a witness generally may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant. *Smith v. State,* 273 Md. 152, 157 (1974). The "discretion" of a trial judge to preclude harassment, moreover, is considered a "duty" in protecting witnesses from an examination intended merely to annoy, humiliate or harass. *Alford v. United States,* 282 U.S. at 694.

We note that in exercising that discretion the Supreme Court has described cross-examination as the principal means by which the believability of a witness and the truth of his testimony are tested. Acknowledging "the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation", the Court in *Davis v. Alaska,* 415 U.S. 308, 316 (1974), pointed out that a cross-examiner is not only permitted to delve into a witness's perceptions and memory, but the cross-examiner is allowed to impeach, "i.e., discredit" the witness.

What is referred to as a "broad discretion" of the trial judge, upon examination, becomes a rather narrow one. The

right to discredit an accuser being one of constitutional dimension, *Davis, supra,* can be but limitedly circumscribed. It appears that only to the extent that the examination strays from extracting from a witness that which discredits the credibility of his testimony, and broaches upon an effort rather to humiliate his person, that the duty to protect at the other end of the spectrum arises. *Mulligan v. State,* 18 Md. App. 588 (1973).

> " '[A] clear distinction is to be taken between those matters called for on cross-examination which merely excite prejudice against the witness, or tend to humiliate him or wound his feelings, and those matters, on the other hand, which are calculated, in an important and material respect, to influence the credit to be given to his testimony. As to the latter class, the witness cannot be shielded from disclosing his own character on cross-examination, and for this purpose he may be interrogated upon specific acts and transactions of his past life; and if they are not too remote in time, and clearly relate to the credit of the witness, in an important and material respect, it would be error to exclude them.' " 3A Wigmore, *Evidence,* § 983, quoting *Territory v. Chavez,* 8 N.M. 528, 532 (1896).

The "discretion" then, between the defendant's right to discredit testimony and the trial judge's duty to protect a witness is solely one of relevance of the questions to the witness's credibility. The relevancy test at this juncture does not regard the elucidation of one of the main issues at trial, it is whether the answer elicited will be a useful aid to the court or jury in appraising the credibility (not necessarily the veracity) of the witness and in assessing the probative value of his direct testimony. McCormick, *Handbook of the Law of Evidence,* § 29 (2d ed. 1972); see *DeLilly v. State,* 11 Md. App. 676, 681 (1971). *Accord, Kirby v. State,* 48 Md. App. 205, 209-210 (1981).

At the point during the trial at hich the judge's determinative ruling curtailed ap ilant's right to cross-examine (and, if necessary, produce supportive evidence, see Smith, supra), the court had before it proffered evidence of a substantial psychiatric history, indicating a contemporary instability, which affected the victim's contact with reality as well as his ability "to recollect issues in any kind of detail." The reliability of the proffer was endorsed by its transmission through an officer of the court designated and directed by the court to enlighten it on the issue to be decided. The reliability of that source may hardly be questioned,[1] when we remember that a proffer to permit an initial questioning regarding credibility needs but minimal support. Apparently it need be little more than an "articulable suspicion", or at most "probable cause" to believe that the facts elicited will be relevant to credibility. See Cox, supra.

Were we faced with the limited proffer by appellant in limine, however, our own conclusion may have been that the ruling at that juncture was not improper both due to its sparsity as well as the advisory nature of the motion, see, e.g., Yuen v. State, 43 Md. App. 109, 119 (1979). When the court intervened rather than deny the motion for want of support or its advisory nature, it reopened its ruling at an appropriate time during trial and subjected itself to all of the information gathered either by appellant or itself. Yet even then the court decided that

"... the diagnosis that he [Mr. Conti] read is a label they put on people and the classic symptoms of this kind in a condition he gave. Whether these symptoms apply to this individual we don't know.

---

1. The State questions the adequacy of appellant's proffer absent an expert witness or the victim's actual psychiatric records. When at the pretrial motion the court assumed the responsibility for obtaining further information, the reliability or the expertise of the court's Medical Administrator may not be subject to question for purposes of determining relevancy of the information sought by and reported to the court.

From the limited information that we have from Mr. Conti from the hospital records I don't think there is sufficient information at this time to permit an interrogation of the witness on that basis and I don't think it is practical to continue the case over at this point."

It has always been recognized that, where the lines of inquiry are designed to shed light on the credibility of a witness, the criteria of relevancy are vague. C. McCormick, *Evidence,* (2d ed.) § 29 at 59. The purposes of the cross-examination may even be experimental since the examiner often has not had an opportunity to interview the witness, and usually as an adversary, the witness does not willingly divulge his peccancies, peculations or peculiarities. Too tight a rein on cross-examination may unduly curb its purpose and its usefulness. *E.g.,* see *Wellman, The Art of Cross-Examination* (4th ed.) ch. 26 at 468, *et seq.* It is particularly true in a case wherein the inquiry into matter subject to statutory protection, Md. Cts. & Jud. Proc. Code Ann. § 9-109, that exploratory questions (not violating the psychiatrist-patient privilege if raised) should liberally, *but carefully,* be allowed. The State seems to argue that the court may require a proffer of the very detail that the inquiry seeks to elicit and that is simply not so.

In determining the relevance of an inquiry into a witness's psychological instability, there is some room for discretion such as defining whether the particular disorder affects factors of credibility like memory, observation, exaggeration, imagination, etc. But even that limited sphere is further restricted by the weight of the evidence so indicating. The proffer need not be that proof beyond a reasonable doubt, or even by a preponderance of evidence, will show that such disorder is or was prevalent. It need only show that inquiry is likely to so divulge such a defect in the witness.

The trial judge in liberally permitting a broad scope of credibility inquiry must balance not only the waste of

judicial time factor (as was implicit here) against the value of exploration, but must take particular care not to permit annoying, harassing, humiliating and purely prejudicial attacks unrelated to. credibility. Like bad acts, not every disorder is relevant to a witness's credibility. See *Burgess v. State,* 161 Md. 162, 173 (1931).

The key that should have caused the court to open the door to inquiry was that submitted by its Medical Administrator who not only outlined the lengthy psychiatric history of the witness, but noted from the record that Majors was a person with "a mixed emotional disturbance and borderline personality" which the Administrator explained as one

> "who experiences from time to time under stress episodes of psychosis or losing touch with reality and comes back into reality fairly easily."

Whether that definition was applicable to the witness-victim, the Medical Administrator did not know specifically, but

> "in stress someone with that diagnosis could tend to become psychotic and out of touch with reality.
> The piece that I might add would be to [say that] if he had been out of touch with reality at the time of the offense he would not be able to recollect issues in any kind of detail."

Had appellant been permitted to elicit even that much of a basis upon cross-examination of the victim, a serious question would have been cast on the victim's recollection of the appellant's participation in the episode. The appellant's peculiar explanation of a limited participation may or may not have been believed, but as in *Davis v. Alaska,* he had a right to have his version fully in balance before the factfinder. See also *Fletcher v. State,* 50 Md. App. 349 (1981).

Of interest is our further observation that the Medical Administrator appears to have observed the witness during his direct and cross-examination in the State's portion of the trial, and during his own in camera testimony observed that:

> "Additionally, a Courtroom situation is a tremendous amount of stress for anybody and that apparently wasn't stress enough for him [the witness] to be out of touch."

We are caused to wonder, however, if cross-examination had been permitted regarding his present and past psychiatric condition, whether the added stress would have caused him to "be out of touch" with reality in front of the jury. That in itself, although a seemingly cruel observation, is a credibility factor possibly significant to a jury. Here, of course, the balance is more delicate between when the right to inquiry becomes a harassment. That the mental illness may have been a source of humiliation to the witness on the other hand, is not of itself sufficient to warrant a preclusion of the inquisition if that which is sought is relevant to credibility. The relevance may very well coincide with that which humiliates and, if equal in degree, the right to proceed prevails over the duty to protect.

When we review the exercise of a trial judge's discretionary power to control the extent of credibility inquiry of a psychologically abnormal witness, the extent of that cross-examination some say, "rests in the discretion of the trial judge and is reversed only in the case of clear abuse resulting in manifest injustice to the complaining party." See generally Anno. 44 A.L.R.3d 1203, 1208. We observe that appellate judges sit in a less frenzied atmosphere and second guess a trial judge's judgment where they determine not so much whether "manifest injustice" clearly resulted but whether substantial harm *may* have resulted from the erroneous determination. Because only the jurors might know what would have occurred, we often must assume that the misjudgment was prejudicial, despite the fact that an "abuse" was not "clear" nor the "injustice" manifest. It is enough to compel a reversal that a constitutional right was improperly restricted leaving prejudice an obvious possibility. While that may not seem fair to the trial judge who must shoot from the hip in the heat of the fray, it is not the judge who is on trial. Our review is not concerned with

fairness to him, but only whether he has been so to the accused.

Upon reversing and remanding for a retrial, we caution appellant and admonish the court that the suggestion by appellant that the witness's entire psychological profile and/or record "should be presented to the jury for whatever value it has in assessing the complainant" is absurd. The inquiry must be carefully limited to that which is relevant to credibility. The trial judge's duty to which we have alluded is to quickly curtail lapses from that limitation, the effect of which may be merely to annoy, harass or humiliate. The stress factor also may be tested by proper cross-examination of relevant facts but may not be pressed by emotional tangents solely geared to seek a breaking point. The balance in permitting the exposure of credibility gaps and protecting an unstable mentality from improper pressure is a delicate one. But trial judges were never promised that our job would be easy.

*Judgment reversed.*
*Case remanded for retrial.*
*Costs to be paid by Mayor and City*
    *Council of Baltimore.*