728

# NORMAN HENRY GRADY SMITH *v.* STATE OF MARYLAND

[No. 189, September Term 1983.]

*Decided October 13, 1983.*

The cause was argued before MOYLAN, ADKINS and BLOOM, JJ.

*Michael R. Braudes, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Jillyn K. Schulze, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Richard E. Jordan, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

ADKINS, J., delivered the opinion of the Court.

Charged with robbery with a deadly weapon, theft, use of a handgun in the commission of a crime of violence, and battery, appellant Norman Henry Grady Smith was tried by a jury in the Circuit Court for Montgomery County (Latham, J. presiding). He was convicted of theft and battery, and sentenced to concurrent terms of imprisonment for six months for theft and ninety days for battery. On appeal, he contends that:

> 1. the trial court impermissibly restricted the cross-examination of two State's witnesses;
>
> 2. the trial court, in the presence of the jury, made prejudicial comments about the testimony of a defense witness;
>
> 3. he was denied the right to be present at a critical stage of the trial;

4. his motion for a mistrial, based on jury coercion, should have been granted; and

5. the trial court erred in failing to grant a continuance.

## Background

Although the sufficiency of the evidence to sustain Smith's conviction is not an issue in this case, his contentions can best be discussed in the light of the rather bizarre facts presented to the trial court.

The testimony of the prosecuting witness, Penelope Stuelant, supported in various particulars by other evidence, was that on September 26, 1981, she was employed by Visions Escort Service, in the District of Columbia. Early in the morning on that date, Visions received a telephone call requesting that an escort be sent to what later turned out to be Smith's address in Wheaton, Maryland. Stuelant called a number given her by the Visions dispatcher and spoke with a young man whose voice she later identified as Smith's. She was given directions to Smith's home and arrived there between 5:00 and 6:00 a.m., driven by cab driver Charles Stroman. Smith met her at the front door and accompanied her to his attic bedroom, where he paid her the agreed fee of $55 for escort services. He then requested her to engage in sexual acts she described as "kinky" and which she declined to perform.

Smith became abusive and refused to let her leave. After some forty-five minutes, Stuelant persuaded him to allow her to depart by saying there was a cab waiting outside, and that if she did not contact Visions, the police would be called. The two walked downstairs and out the front door. When Smith observed neither cab nor police, he drew a pistol and demanded Stuelant's pocketbook. A struggle ensued, during which Stuelant was injured. Smith snatched her pocketbook, which contained the $55 as well as other money, and ran into the house, slamming the door. She screamed and pounded on the door with her shoe until the police arrived, in massive

force. They ordered Smith and his parents out of the house, handcuffed them, searched the house, and eventually took the Smiths to the police station. Stuelant was transported to a hospital for treatment of her wounds.

According to the defense, presented through the testimony of Smith and other evidence, the call to Visions had been accomplished not by Smith but, unbeknownst to him, by a friend who was a "known prankster". Smith was checking his dog when he heard a knock on the door. He opened it to find Stuelant. Not knowing who she was or why she was there, he at first refused to admit her. After some discussion, he agreed to give her fifteen cents to make a call from a pay phone. When he started upstairs to get change, she followed him. He threatened to call the police; she turned and went downstairs; he pushed her out the door. Stuelant then opened her purse and started to remove a gun. A struggle for the gun ensued during which Stuelant was injured. Eventually, Smith broke away and reentered the house. His parents held the door shut while he called the police, who arrived in due course and, as stated, in massive force, concluding the incident by taking the Smith family to the police station.

## Restriction of Cross-Examination

As our brief recital of the facts indicates, the credibility of Stuelant's testimony was important to the State's case. Among the ways the defense sought to undermine her credibility was to show that she was a prostitute. This she stoutly and steadfastly denied, although she admitted that on occasion she had granted sexual favors in exchange for money. During her extensive cross-examination by the defense, the following occurred:

Q. Now, during the course of your profession, would it be accurate to say that you have to deceive people to be a successful prostitute?

A. Deceive who?

MR. JORDAN [Prosecutor]: I object, Your Honor.

Q. You have to lie?

MR. JORDAN: I object.

THE COURT: Wait a minute, the objection will be sustained.

\* \* \*

MR. BERMAN [Defense Counsel]: Well, prostitutes are known to lie, are they not?

MR. JORDAN: I object.

THE COURT: Objection sustained.

Q. You are know [sic] to lie?

MR. JORDAN: Object.

THE COURT: Sustained.

Citing, *inter alia, Reese v. State,* 54 Md. App. 281, 458 A.2d 492 (1983) and *Cox v. State,* 51 Md. App. 271, 443 A.2d 607 (1982), *cert. granted* July 20, 1982, Smith argues that the trial judge's refusal to permit Stuelant to answer defense counsel's questions was error because when the subject-matter of the examination is credibility, the judge's normally broad discretion to limit cross-examination does not operate.

In *Reese,* we discerned error because the trial judge had excluded reliable evidence of the victim's mental condition — a condition which, it appears, "affected the victim's contact with reality as well as his ability 'to recollect issues in any kind of detail.'" 54 Md. App. at 288. In *Cox,* we reversed because the trial judge did not permit testimony that the prosecuting witness had previously made a criminal accusation in another case, and had then admitted the accusation to be false — a specific instance of past dishonesty. Thus, the circumstances of *Reese* and *Cox* are factually distinguishable from those in the case at bar. But we did say, in the former case, that "[w]hat is referred to as a 'broad discretion' of the trial judge [to limit cross-examination on the issue of credibility], upon examination, becomes a rather narrow one." 54 Md. App. at 286.

Despite the narrow limits of judicial discretion in this context, it nevertheless does exist. "The trial judge in liberally permitting a broad scope of credibility inquiry must balance not only the waste of judicial time factor . . . against the value of exploration, but must take particular care not to permit annoying, harassing, humiliating and purely prejudicial attacks unrelated to credibility." *Reese v. State, supra,* 54 Md. App. at 289-90. Furthermore, even when cross-examination as to credibility is involved, the judge retains discretion to decide "whether the particular question posed is a proper one." *Cox v. State, supra,* 51 Md. App. at 298 (Wilner, J., concurring). Finally, in deciding a judge has erred in limiting cross-examination, we may consider whether the defendant has been prejudiced by the court's ruling. *Fletcher v. State,* 50 Md. App. 349, 356-57, 437 A.2d 901 (1981).

In the case before us, the questions to which objections were sustained were in part without proper foundation (no showing was made or attempted as to Stuelant's expertise as to the truthfulness of prostitutes); they were unduly broad; and some were argumentative. Thus, they were improper in form. Moreover, the trial judge may well have concluded that they were designed to harass or humiliate the witness. And the prohibition of this particular line of questions, in addition to its bearing on the conservation of judicial time, was scarcely prejudicial to Smith. Defense counsel's lengthy cross-examination of Stuelant had elicited much material bearing on her credibility, including numerous instances of prior inconsistent statements, her prior exchanges of sexual favors for money, and the fact that she had lied to public authorities in order to obtain welfare payments while she was employed. We do not think Judge Latham erred in sustaining objections to the questions now before us.

Smith also contends that his cross-examination of Charles Stroman was impermissibly limited. Stroman, it will be recalled, drove the taxicab in which Stuelant was conveyed to Smith's abode. He was waiting in the wings when Stuelant and Smith emerged from the house after their

unproductive forty-minute encounter. He testified for the State, and in several respects substantiated Stuelant's version of the facts.

During cross-examination, Stroman admitted that he knew Stuelant and that he had given her rides before. He denied knowledge of who her employer was, did not know the nature of her work, and did not know her as a prostitute. He testified that he did not get a percentage of her earnings. He was asked:

> Q. You are aware that it is against the law to transport a woman across state lines for immoral purposes?

An objection to this question was sustained. According to Smith, this ruling was improper because "[h]ad Stroman admitted awareness that driving Stuelant between the District of Columbia and Maryland was a crime, it would have raised an inference that a major portion of his testimony was a self-serving lie."

We disagree. In addition to other possible defects, the question was too broad. It is "knowing" interstate transportation for immoral purposes, not the mere fact of such transportation, that is proscribed. 18 U.S.C. §§ 2421-2422. Judge Latham did not err in sustaining the objection to this question.

### Prejudicial Comments About Defense Testimony

As we have noted, the police response to the Smith residence following the final struggle between Smith and Stuelant was massive. Fifteen to twenty officers and numerous vehicles arrived. The Smiths were forced to come out of their homes at rifle-point, and were, according to their testimony, especially that of Mrs. Smith (appellant's mother) treated with something less than courtesy. In an apparent effort to produce juror sympathy, the defense dwelt at length on this police conduct, in addition to eliciting from Mrs. Smith other evidence more material to the issue of

whether appellant was guilty of the offense for which he was being tried.

Falling into the trap laid by the defense, the prosecutor engaged in extensive cross-examination of Mrs. Smith on the subject of police harassment. Near the end of the cross-examination this colloquy took place:

> THE COURT: Excuse me, Mr. Jordan, this may be of interest to you, but I can't keep this jury here any longer. Most of this testimony that we've had for the last hour has nothing to do [with] whether this young man is guilty of [sic] not guilty of these offenses. Both the direct and cross-examination.

> MR. JORDAN: The defense seems to think it has importance, Your Honor.

> THE COURT: Well, I'm telling you it doesn't so can't we wind this up this evening.

> MR. JORDAN: I'm just about finished.

> THE COURT: Two questions. One question.

> MR. BERMAN: Objection.

Smith argues that these remarks by the court were prejudicial because they "effectively destroyed relevant defense evidence." We do not see it that way.

Defense counsel's objection to the court's comment (if those are what the objection referred to) was somewhat belated. No request for a corrective instruction was made. Thus, Smith's claim that the comments were prejudicial may not have been preserved. Md. Rule 1085. But in any event, taking the court's remarks in context, it is apparent that he was directing them to the approximately fifty percent of Mrs. Smith's testimony that had nothing to do with the case. It is further apparent that he was attempting to place back on the tracks a trial that had been badly derailed. It is inconceivable that this single comment, made during the course of a three-day trial, could have prejudiced the jury, especially in view of the court's eventual instruction to the

jury that "comments to counsel . . . are not to be taken by you as . . . any indication of the court's opinion as to how you should decide this matter" and "[i]f you should decide that during the course of this trial that I have expressed or intimated any opinion as to the facts you should disregard it."

If Judge Latham's comments were error (and we do not hold they were) the error beyond a reasonable doubt was not prejudicial. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

### Denial of Right to be Present — Denial of Mistrial

Since both of these contentions have to do with a juror who became briefly indisposed during jury deliberations, we will deal with them together. What happened was this:

The jury was sent out to deliberate at about 3:10 p.m. on the third day of the trial. Judge Latham went to another courtroom to empanel the jury in another case. At about 4:35 p.m. the bailiff who had the jury in charge heard a loud knocking on the jury room door. He opened it, and Juror No. 47 came out in a "flustered" condition. She "said she was experiencing severe claustrophobic reaction to being in the room that she had to have fresh air immediately and that she couldn't breathe." The bailiff locked the other eleven jurors in the jury room after cautioning them not to deliberate, and escorted the ailing juror to Judge Latham's chambers, whence he contacted the judge by telephone.

At the judge's suggestion, the bailiff took Juror No. 47 for a walk outside, during which she explained that she had had occasional claustrophobic episodes. After fifteen or twenty minutes she said she had completely recovered and was returned to the jury room.

At about 5:10 p.m., Judge Latham returned and in the presence of counsel called Juror No. 47 out of the jury room and questioned her as to her health. She said she was all right. Later, while the jury was having dinner, Judge Latham again questioned Juror No. 47 about her health and was again assured that all was well. At 10:10 p.m. the

foreman reported that the jury had reached agreement on one count. Sometime later, it brought in its verdict. While the jury was deliberating, defense counsel moved for a mistrial because "the sanctity of the jury room has been invaded or prevaded *[sic]* as a result of this illness." The motion was denied.

Smith now attempts to construct two arguments on the foundation of this incident. The first is that since he was not present when various communications with the ill juror took place, he was denied the right to be present at every stage of his trial. *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981). *Bunch v. State,* 281 Md. 680, 381 A.2d 1142 (1978). Md. Rule 724 a. The second is that the mistrial should have been granted because there is a possibility that the Juror No. 47 "returned a verdict in accordance with the will of the majority so as to escape her confinement, rather than because of her genuine belief that [Smith] was guilty."

As to Smith's presence or absence during the three discussions with Juror No. 47, the record is unclear. But assuming the worst — that he was absent — we think his contention is without merit.

When communications between court and juror relate to "juror impartiality or disqualification" they are "a stage of the trial at which the defendant has a right to be personally present." *Williams v. State, supra,* 292 Md. at 212. The issue in *Williams* was the defendant's absence during the voir dire of prospective jurors. The issue in *Bunch v. State, supra,* was the defendant's absence during a discussion of juror disqualification for possible bias, a problem that had first come to light during jury deliberations.

But as the Court of Appeals observed in *Bunch,* "not everything that happens in a criminal case after the jury is impaneled is deemed a 'stage of the trial' at which the defendant has a right to be present." 281 Md. at 684. There are circumstances under which a trial may be said to be suspended so that the court may attend to administrative or housekeeping duties in connection with it. *Hughes v. State,* 288 Md. 216, 224, 421 A.2d 69 (1980). The defendant does not have a right to be present if those circumstances exist.

If communications between court and juror relate not to juror impartiality or disqualification, but to whether a juror should be excused because of personal hardship,

> the personal presence of the defendant can add little or nothing to [that determination]. This question does not implicate the interest of the defendant. Instead, the interests to be balanced are those of the ... juror and the administration of the court system.

*Porter v. State,* 289 Md. 349, 356, 424 A.2d 371 (1981). *See also Tisdale v. State,* 41 Md. App. 149, 396 A.2d 289 (1971).

In the case at bar, the discussions with Juror No. 47 had to do with whether she was physically able to continue to serve on the jury. They had nothing to do with bias or disqualification. Therefore, Smith did not have a personal right to be present during those discussions.

As to Smith's mistrial motion, it was apparently based on some notion that the jury might have deliberated during the absence of Juror No. 47. The record makes it clear that this did not occur, and he has abandoned that argument on appeal. Since that was the only reason advanced below for granting a mistrial, his jury coercion argument may well not have been preserved. *Von Lusch v. State,* 279 Md. 255, 263, 368 A.2d 468 (1977).

In any case, the coercion argument is without merit. When the jury retired at 3:10 p.m., each juror told the judge he or she felt fit. After her initial problems at 4:35 had been resolved by the administration of fresh air, Juror No. 47 said she was fully recovered. At 5:10 p.m. she told Judge Latham, in the presence of counsel, that she was fine. At dinner time, she reaffirmed her fitness. On several occasions, she was urged to communicate if she did not feel well. She did not communicate. The jury continued to deliberate until after 10:00 p.m. All of this negatives any suggestion of continuing ill-health on the part of Juror No. 47, or any notion of undue haste in the jury deliberations. The case is totally unlike *People v. Kurth,* 34 Ill.2d 387, 216 N.E.2d 154 (1966) in

which, during jury selection, the judge revealed to counsel that one juror had a long standing fear of confinement, but refused to disclose her name, to permit counsel to question her or to excuse her. Nor is it like *Reemsnyder v. State,* 46 Md. App. 249, 416 A.2d 767 (1980) in which a mistrial was held proper when a juror became too ill to continue deliberations, and there was no indication of when he might recover sufficiently to resume his duties.

Judge Latham did not err in denying Smith's motion for a mistrial.

### Denial of Continuance

At the outset of Smith's trial, defense counsel said he was sick, and asked for a continuance. The record does not disclose the nature of his malady, but apparently he wanted to see a doctor to have some tests. Judge Latham suggested that jury selection be completed, after which the court would recess so that counsel could see his physician. Without apparent objection on the record, this was done.

Smith now says that his lawyer was forced to "rush through jury selection, paying scant attention to [Smith's] wishes regarding which jurors should be stricken and which retained."

The problem with this contention is two-fold. First, the record discloses nothing about the nature or extent of counsel's ailment. He was, however, able to participate vigorously in two days of trial immediately following the date of jury selection. Second, Smith has not supplied us with any transcript reflecting the jury selection process. Therefore, there is nothing for us to review to determine whether his bald assertions of undue haste are correct, or caused prejudice to him. *Van Meter v. State,* 30 Md. App. 406, 352 A.2d 850 (1976).

*Judgments affirmed.*
*Appellant to pay the costs.*