492 A.2d 1320

**Rickey EILER**

v.

**STATE of Maryland.**

**No. 1302, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

May 29, 1985.

440

Russell J. White, Towson (Susan V. Vitale, Towson, on brief), for appellant.

Jillyn K. Schulze, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Diane G. Goldsmith, Asst. Atty. Gen., Baltimore, Sandra A. O'Connor, State's Atty., Baltimore County, Joseph Steigerwald and David W. Moore, Asst. State's Attys., Baltimore County, Towson, on brief), for appellee.

Argued before MOYLAN, BISHOP and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

After a jury trial in the Circuit Court for Baltimore County,[1] Rickey Eiler, appellant, was convicted of felony murder. He was sentenced to life imprisonment, of which all but thirty years was suspended. Appellant presents the following questions on this appeal.

1. Did the trial court commit prejudicial error in refusing to permit testimony by Dr. Michael Spodak

---

1. This was appellant's second trial. The first trial ended with a hung jury.

regarding the State's key witness' psychological history?

2. Did the trial court commit prejudicial error when it refused to permit appellant the right to present evidence and/or cross-examine the State's witness regarding pending criminal charges to show bias, prejudice or coercion?

3. Did the trial court commit prejudicial error by permitting the State to cross-examine the appellant about certain derogatory remarks made in the first trial?

## 1.

Dorothy Pirotte, an important State's witness and appellant's accomplice, testified at trial that she and appellant had planned to rob the victim, Harris Smuckler, of his money and jewelry.[2] The plan, conceived by appellant, was that Pirotte would lure Smuckler into her bedroom to engage in sex and appellant would hit him with a stick and then overcome him. When appellant struck Smuckler as planned, Smuckler fought back, which resulted in appellant's repeatedly striking him, causing his death. The victim's body was placed in the trunk of the victim's car, along with several bloody items from Pirotte's bedroom, and driven to a wooded area, where the bloody items were discarded. The car, with Smuckler's body still in the trunk, was left in Dundee Village. Appellant and Pirotte returned by taxi to Pirotte's home and finished cleaning the murder scene. Pirotte and appellant divided money taken from Smuckler and appellant appropriated a pouch containing diamond rings, also taken from Smuckler. Significant during her testimony, on both direct and cross-examination,

---

**2.** Pirotte testified that she and appellant planned to overcome and rob the victim in order to get even with the victim for suggesting that Pirotte perform sexual acts at his son's stag party. The victim, the owner of a jewelry store, often wore and carried several pieces of jewelry to advertise his business.

was Pirotte's frequent inability to remember specific incidents, details and conversations.

On cross-examination, although testified to on direct, appellant delved into Pirotte's use of cocaine on the day of the murder, her plea agreement with the State,[3] and the fact that she had been convicted of second degree murder, in connection with Smuckler's death, at the time that she testified. It was also brought out that she was under medication—Mellaril, 50 miligrams per day and Elavil—prescribed by a psychiatrist,[4] whom she saw once per week.

■ Appellant sought to offer the testimony of Dr. Spodak as to Pirotte's mental history. Because Dr. Spodak had not personally examined her, it was proposed that he testify, not from her conversations with her psychiatrists, but from the records compiled at the County Detention Center while Pirotte was detained there; specifically, it was proffered that he would testify as to Pirotte's psychological diagnosis and the dosage and type of medication prescribed for her.[5] Appellant contended at trial, as he does now, that Dr. Spodak's testimony would have revealed that the disorders suffered by Pirotte "could have altered her perception in such a manner so as to discredit her testimony". He further urged, as he does now, relying on *Reese v. State*, 54

---

3. In return for her truthful statement against appellant, the State agreed to recommend that Pirotte receive a sentence of twenty years incarceration.

4. During a bench conference requested by the State when appellant began its inquiry into Pirotte's psychiatric condition, the trial judge ruled that questions going to a psychiatric diagnosis would not be allowed, but that those concerning whether Pirotte was under psychiatric care would.

5. At the prior trial, Dr. Spodak was allowed to testify concerning the conversations that Pirotte had with Dr. Rinn and Dr. Butchart, the psychiatrists who compiled the records. In cases of severe mental disorder, such as schizophrenia, he said, a patient may be given one hundred to four hundred milligrams of Mellaril daily. Pirotte's dosage was reported to be two hundred seventy-five milligrams daily while detained.

Md.App. 281, 458 A.2d 492 (1983), that this testimony was admissible despite the psychiatrist/patient privilege.[6]

The State countered with a motion *in limine* in which it requested that the testimony be prohibited. The State complained then, as it does now, that because the testimony would rely on records and reports compiled by psychiatrists, and which contained statements made by Pirotte to those psychiatrists, the records are privileged. On appeal, the State additionally contends that the admissibility of Spodak's testimony has not been preserved for appellate review, appellant having failed to offer the testimony after its motion *in limine* was granted.[7]

A motion *in limine* is not a ruling on the evidence. It is a "procedural step prior to the offer of evidence", which serves the purpose of pointing out, before trial, certain evidentiary rulings that the court may be called upon to make. *Funkhouser v. State,* 51 Md.App. 16, 440 A.2d 1114 (1982). Neither the grant nor the denial of such a motion constitutes reversible error. *Id., Offutt v. State,* 44 Md.App. 670, 410 A.2d 611 (1980). If the admission of evidence is foreclosed by the ruling on the motion, an attempt to introduce the evidence at trial must be made by the way of proffer, *Funkhouser v. State, supra,* or an objection must be interposed:

---

6. Courts and Judicial Proceedings § 9-109(b), Annotated Code of Maryland, provides that a patient or his authorized representative has the privilege to refuse to disclose communications relating to the diagnosis and treatment of the patient's mental or emotional disorder. The privilege belongs to the patient to assert, not to the psychiatrist. *Shaw v. Glickman,* 45 Md.App. 718, 415 A.2d 625, *cert. den.* 288 Md. 742 (1980); *Bremer v. State,* 18 Md.App. 291, 307 A.2d 503 (1973), *cert. den.* 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974).

7. The trial judge stated that "[t]he Court believes that in permitting Dr. Spodak to testify that it would be in direct contravention of the assertion of Dorothy Pirotte's privilege, in that Dr. Spodak must of necessity rely upon the reports of the psychiatrist ..." Thus, his ruling was based on the applicability of the patient/psychiatrist privilege.

A second basis for the ruling was that Dr. Spodak's prior testimony, which was reviewed by the judge, indicated that Dr. Spodak's opinion may have been different if he had examined Pirotte.

There is no exception to the ... rule, which requires the recording of an objection in the trial below, where the question of admissibility of evidence has previously been raised in a pre-trial motion *in limine.*

*Lapelosa v. Cruze,* 44 Md.App. 202, 207, 407 A.2d 786 (1979), *cert. denied,* 287 Md. 754 (1980).

■ After the trial judge's ruling on the motion *in limine,* the following colloquy occurred between appellant's counsel and the court.

MR. WHITE: May I say something just for the record?

THE COURT: Yeah, you certainly may, and you may obviously proffer your testimony of Dr. Spodak.

MR. WHITE: Number one, I would proffer that it would be a conflict of interest for Mr. Steigerwald and Mr. Moore to be representing the witness, Dorothy Pirotte. Their interest doesn't necessarily coincide with her interest in this matter; their interest being to simply win their case.[8]

Number two, I would proffer that Dr. Spodak could give testimony based on facts other than communications between Dorothy Pirotte and her psychiatrists, and could give expert testimony in that regard without going into any communications between Dr. Rinn or the other psychiatrist and Dorothy Pirotte, which would not violate the statute. (footnote added)

THE COURT: Okay. Do you want to put anything else on the record, Mr. White, with regard to what Dr. Spodak's testimony would be, unless very possibly by agreement—and I am just suggesting—that need not be—that between you and the State you could proffer that his testimony would be as it was in the prior trial and in the transcript. I don't know. The State may not be agreeable, and you may not be agreeable; and

---

**8.** The State represented in the motion *in limine* that Pirotte had assigned Joseph Steigerwald and David Moore, both Assistant State's Attorneys, as her authorized representatives to assert her psychiatrist-client privilege. *See,* Md.Code Ann., Courts Article § 9–109(a).

you can give further consideration to it, or you can put on the record, if you so desire for preservation of the record what you would proffer would be Dr. Spodak's testimony.

MR. WHITE: Well I would proffer—one thing would be his testimony that he would describe what the drug Mellaril is used for; and the doses that Dorothy received, is used for psychosis. He could describe what psychosis is, number one.

He could further—after review of the records he could describe that Dorothy Pirotte has been found by a psychiatrist at the County Jail to be suffering from psychosis, schizophrenia, paranoia, that she was suicidal; and I think he could do that without going into any communications between her and her doctor.

I think the relative importance of this testimony certainly outweighs any other considerations in the case. That would be it.

The colloquy clearly demonstrates that following the court's ruling on the motion *in limine,* appellant made a proffer of Dr. Spodak's testimony.[9] Moreover, that proffer was adequate:

... a proffer to permit an initial questioning regarding credibility needs but minimal support. Apparently it need be little more than an "articulable suspicion", or at most "probable cause" to believe that the facts elicited will be relevant to credibility. (Citation omitted)

*Reese v. State,* 54 Md.App. 281, 288, 458 A.2d 492 (1983).

In *Reese* we faced, in a somewhat different context, the very issue which is here presented. The defendant there was charged with armed robbery. He sought to cross-examine the victim as to his psychiatric history, proffering that the victim had been a patient receiving treatment at

---

**9.** While the ruling and the proffer were both made in the judge's chambers, the proffer being made immediately following the ruling, we do not perceive that as in any way affecting the preservation of the objection for review.

Springfield State Hospital. The court sought additional psychiatric information from the Medical Administrator of the Supreme Bench of Baltimore, which resulted in the further proffer that the victim had a substantial psychiatric history, including a contemporary instability which affected his contact with reality. Despite this proffer and the fact that the major issue in the case was the credibility of the victim, the trial court refused to allow the defendant to cross-examine the victim regarding his psychiatric history. We were thus called upon to determine "... at what point the judge's discretion totally to restrict credibility cross-examination of a witness begins and ends." *Id.* at 285, 458 A.2d 492.

We began our inquiry by noting the role that cross-examination plays in insuring that a defendant is afforded a fair trial.[10] We next sought to determine the proper balance between the right of the defendant to cross-examine his accusers and the "broad discretion" of the trial judge to determine the scope of cross-examination. We concluded that:

> What is referred to as a "broad discretion" of the trial judge, upon examination, becomes a narrow one. The right to discredit an accuser being of constitutional dimension ... can be but limitedly circumscribed.

*Id.* at 286, 458 A.2d 492. And further that:

> The "discretion" then, between the defendant's right to discredit testimony and the trial judge's duty to protect a witness is solely one of relevance of the questions to the witness's credibility. The relevancy test at this juncture does not regard the elucidation of one of the main issues

---

**10.** We pointed out that in *Alford v. U.S.,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), the right of cross-examinations was characterized by the Supreme Court "as the essence of a fair trial"; that the Fifth Circuit in *U.S. v. Williams,* 592 F.2d 1277 (1979), interpreted the Sixth Amendment right to cross-examine for purposes of impeachment as requiring a particularly wide scope on matters relevant to credibility; and that the Eleventh Circuit in *U.S. v. Lindstrom,* 698 F.2d 1154 (1983) considered the denial of broad latitude in cross-examining a witness as to his mental condition an abuse of discretion.

at trial, it is whether the answer elicited will be a useful aid to the court or jury in appraising the credibility (not necessarily the veracity) of the witness and in assessing the probative value of his direct testimony. (Citations omitted)

*Id.* at 287, 458 A.2d 492.

Recognizing that the parameters of relevance are vague when credibility is at issue, that cross-examination is often exploratory, and that too tight a rein on cross-examination may defeat its purpose and effectiveness, we particularly pointed out that exploratory questions should be liberally, but carefully, allowed when the matter inquired into is subject to statutory protection. Recognizing that discretion must still be exercised in determining if a particular psychiatric disorder affects credibility,[11] we endorsed its careful exercise so as to maintain a balance between the need to control cross-examination and the value of exploratory questioning. Having found, in light of the proffer, that cross-examination had been unduly restricted, we reversed.

Proceeding to a consideration of the case *sub judice*, we note at the outset that appellant's chief argument relates to the trial court's refusal to permit the testimony of Dr. Spodak. Notwithstanding this difference, he argues that *Reese is* apposite and mandates reversal. The State responds on several fronts. First, it contends that the court properly could have construed Dr. Spodak's testimony as involving "communications relating to diagnosis or treatment of the patient's mental or emotional disorder" and therefore privileged. Second, it argues that because Dr. Spodak did not examine Pirotte, "the trial court properly determined that Dr. Spodak should not be allowed to testify". Finally, the State questions the adequacy of the proffer, suggesting that it did not provide a nexus between Pirotte's condition and how that condition could have affect-

---

**11.** *Testerman v. State,* infra, is an example of the proper exercise of discretion by the trial judge.

ed her credibility.[12] We think the testimony of Dr. Spodak should have been allowed. We will explain.

We find *Reese* to be particularly apposite. As in *Reese*, the court had before it evidence, by way of testimony and proffer, that a key State's witness had a psychiatric history and a current mental condition which required her to take two medications prescribed by psychiatrists, whom she saw once a week. In addition, it had before it the proffer that the witness, while detained in the County Detention Center shortly after the murder, had been found by psychiatrists to be suffering from psychosis, schizophrenia, paranoia, and to be suicidal. Further, the court was advised that Dr. Spodak would define, in detail, what psychosis means and would describe the conditions for the treatment of which Mellaril[13] is prescribed. In addition to all of the foregoing, Pirotte's testimony was replete with instances of non-recall. On this record, we think it patent that inquiry was likely to disclose defects in relevant factors of credibility. A synthesis of the proffers indicates that appellant offered to demonstrate not only that Pirotte was probably suffering from a mental disorder or disorders, but also that such disorder or disorders could affect her ability accurately to perceive and relate the events about which she testified. See footnote 13, *supra*. This case, therefore, is different from *Testerman v. State*, 61 Md.App. 257, 486 A.2d 233 (1985), in which no evidence was present-

---

12. A somewhat similar argument (that psychiatric evidence raises only a collateral issue) was rejected in *United States v. Lindstrom*, supra.

13. The proffer made after the ruling on the motion *in limine* was not as detailed as the proffer made during argument on the motion. At that time, appellant's counsel read from the prior testimony of Dr. Spodak. Significantly, in that testimony Dr. Spodak, in describing the drug, Mellaril, testified that it was a major tranquilizer, indicated "for individuals who may become psychotic or lose touch with reality" and "for the individual who is, has a serious mental illness, has schizophrenia, has an inability to distinguish what is real from what is imaginary ..." Not only did the trial court hear this testimony read, it had access to the transcript, which it reviewed on the motion.

ed to show that the mental disorder (schizophrenia) attributed to the witness would, or was likely to, affect that witness' credibility, with respect to his ability to perceive, to remember or to relate events accurately.

 That the psychiatrist/patient privilege applies to this case is clear. Its applicability, however, cannot prohibit the liberal, but careful, allowance of exploratory questions into Pirotte's mental condition for the purpose of testing her credibility. *Reese, supra*, 54 Md.App. at 289, 458 A.2d 492. Nor does the fact that Dr. Spodak did not examine Pirotte affect our decision. Only the weight of his testimony, not its admissibility, is affected by this lack of examination.

 Before leaving this issue, we point out that the trial court did not consider the admissibility of Dr. Spodak's testimony from the standpoint of its relevance to Pirotte's credibility. We have found error on that basis. Therefore, we feel constrained to say, as we did in *Reese*, that "[w]hile that may not seem fair to the trial judge who [sits in a more frenzied atmosphere], it is not the judge who is on trial. Our review is not concerned with fairness to him, but only whether he has been so to the accused." *Reese, supra*, at 291, 292, 458 A.2d 492. In this ruling, he was not.

### 2.

Although the issue is an interesting one, given the unique factual circumstance in which it arose, we will not address appellant's second issue. We will address his third issue to avoid a recurrence on remand.

### 3.

During the cross-examination of appellant, the following exchange occurred:

Q. [Assistant State's Attorney] I believe you testified on direct examination that this [Dundee Village] was a black area. Is that the way you described it in the prior hearing?

MR. WHITE: Objection, your Honor.

THE COURT: Overruled.

A. [Appellant] No, it ain't the way I want to describe it.

Q. How did you describe it then?

MR. WHITE: Objection.

THE COURT: Overruled.

A. They call it Spade City.[14]

Q. Who are they?

A. It was on like a big bridge which it was wrote up there.

\* \* \* \* \* \*

BY MR. STEIGERWALD [Assistant State's Attorney]:

Q. Directing your attention again to the prior hearing, Mr. Eiler—

MR. STEIGERWALD: Page 55, Russ.

BY MR. STEIGERWALD:

Q. The question was asked, 'What kind of area is Dundee Village?'

MR. WHITE: Your Honor, again I object to the question.

THE COURT: Overruled.

BY MR. STEIGERWALD:

Q. Do you remember how you answered that, Mr. Eiler?

A. Yes, I do.

Q. How did you answer that?

MR. WHITE: I object, your Honor.

THE COURT: Overruled.

A. It was graffiti, how they got it right before you get to Dundee Village, and it says 'Spade City'; and it is got—like painted 'Spade City,' and that is what I always called it, was Spade City.

BY MR. STEIGERWALD:

Q. If I may refer you to the question—

MR. WHITE: May I have a continuing objection?

THE COURT: Absolutely.

---

**14.** "Spade" is a derogatory term used to describe a Black person.

MR. WHITE: Thank you.

MR. STEIGERWALD: In the middle of the page on—

MR. WHITE: The Court knows my reasons.

BY MR. STEIGERWALD:

Q. 'Question: What kind of area was that?' Your answer, 'It wasn't my idea to tell her what to do.' 'Question: What kind of area is Dundee Village?' 'Answer:' —your answer was: 'Spade Area.' 'Question: What do you mean by Spade Area? 'Answer: Colored. 'Question: Colored what? 'Answer: Colored area where mostly colored people there live. 'Question: Is that what you call colored people, spade?' Your answer is: 'It is better than being called black or colored, yes, I think it would be.' "

■ For this evidence to have been admissible, it must have been material, tending to prove a matter at issue in the case, and relevant tending to make a material proposition more or less probable. McCormick, *Handbook of the Law of Evidence* § 185 (3rd ed. 1984).

■ If material and relevant, still, the trial judge must view the evidence in context, *Weiner v. State*, 55 Md.App. 548, 464 A.2d 1096 (1983) and weigh its probative value against the risk of prejudicial impact. *Blondes v. Hayes*, 29 Md.App. 663, 350 A.2d 163 (1976). *Moore v. Volkswagenwerk, A.G.*, 575 F.Supp. 919 (Md.1983). Evidence should be excluded if it may unduly arouse the jury's prejudice, hostility, or sympathy. *Weiner v. State, supra; Smith v. Executive Club, Ltd.*, 458 A.2d 32 (D.C.App.1983).

Appellant alleges that the trial judge erred in admitting the evidence since the evidence was prejudicial and without probative value, and was likely to cause black jurors to look

unfavorably upon him because of his racial comments. The State responds that permitting the testimony was not an abuse of discretion because all prospective jurors were voir dired as to whether testimony concerning racial slurs would adversely affect their impartiality [15] and because appellant failed to preserve the issue.

■ We find the line of questioning to have been prejudicial, irrelevant, and collateral. We can conceive no possible basis for it and the State does not suggest any. It had no tendency to prove any material issue in the case. The situation was exacerbated by the State unnecessarily prodding appellant to repeat his prior statements merely for the purpose of showing his racial prejudice. We warn the State and advise the trial judge that the State's conduct in this regard was reprehensible and will not be tolerated.

■ We agree that voir dire of prospective jurors is a factor to be considered in determining if error is harmless; however, it is but one factor. When we view the totality of the circumstances surrounding the improper cross-examination, we conclude that the trial judge erred and that the error was not harmless. *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976).

JUDGMENT REVERSED; REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL.

COSTS TO BE PAID BY BALTIMORE COUNTY.

---

**15.** A typical question asked on voir dire to prospective Black jurors was:

> Let me ask you something—if any phase of the evidence came out that something was something like a racial slur or something like that referring to a black person as a spade, would that prejudice or bias you to the extent that you might be influenced by it, rather than from the evidence?

All prospective jurors responded in the negative. There were several black members of the jury.