604 A.2d 934

MEDICAL MUTUAL LIABILITY INSURANCE SOCIETY OF MARYLAND

v.

Deborah L. EVANS.

No. 1154, Sept. Term, 1991.

Court of Special Appeals of Maryland.

April 15, 1992.

422

David A. Levin and Jack L. Harvey (Wharton, Levin, Ehrmantraut & Klein, on the brief), Annapolis, for appellant.

Marvin Ellin (Ellin & Baker, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and ALPERT and WENNER, JJ.

WILNER, Chief Judge.

This appeal, which involves a lawsuit against an insurance company, arose out of another action—a medical malpractice suit by appellee Deborah Evans against an anesthesiologist, Clarence Beverly. In a nutshell, Ms. Evans won a judgment against Dr. Beverly for $2.5 million. The doctor was insured by appellant for only one million dollars, leaving the balance of the judgment uninsured and, to a large extent, most likely uncollectible. At various points during the course of the malpractice action, Dr. Beverly demanded that appellant settle the case within the policy limits if it could do so. It is alleged that, at one point, appellant could have settled the case for $500,000, but that it declined the opportunity, offering only $400,000. As a result, Dr. Beverly asserted that he had a claim against appellant for gross negligence and failure to represent his interest in good faith. He filed no action to enforce that claim, however.

In March, 1989, following an attempt by Ms. Evans to seize personal assets of Dr. Beverly in satisfaction of the judgment, Ms. Evans and Dr. Beverly entered into an agreement whereby, in return for Ms. Evans suspending efforts to collect the balance of the judgment against his personal assets, the doctor assigned to her part of his claim against appellant. Beverly reserved to himself a claim for emotional distress and punitive damages but assigned

"all legal rights and interest in any action at law and/or equity against [appellant] for the unpaid portion of the verdict rendered against [Beverly]., in the amount of $1,500,000.00 and also all interest and costs to which [Beverly] would be entitled had he instituted the proceedings in his own name and not made this assignment."

Ms. Evans was given the full right to prosecute the claim assigned to her as well as to settle not only that claim but also the retained claim of Dr. Beverly. The agreement provided, in relevant part, that:

(1) if Ms. Evans pursued the case to judgment, any recovery would be applied to reduce the judgment against Dr. Beverly;

(2) if "she is successful in the action," she would pay to Dr. Beverly's personal attorney, Stuart M. Salsbury, $50,-000 "in past, present and future legal expenses which have arisen and will arise by virtue of the necessity of counsel during the pendency of the above matter";

(3) if she settled the case, including Dr. Beverly's claim, for less than the unpaid part of the verdict (plus interest and costs), she would pay Beverly $50,000 in satisfaction of his retained claim; and

(4) if she settled for more than the unpaid part of the verdict (plus interest and costs), Beverly would get 60% of the excess and Ms. Evans would get the unpaid part of the verdict (plus interest and costs) plus 40% of the excess over that amount.

Armed with this assignment, Ms. Evans, as assignee, sued appellant in the Circuit Court for Baltimore City, alleging that the company breached its duty of good faith to Dr. Beverly and was grossly negligent by (1) failing to negotiate with Ms. Evans's counsel in good faith, and (2) once the $500,000 award was made by the Health Claims Arbitration Panel, failing to offer to settle for that amount despite (i) repeated urgings from Dr. Beverly and Mr. Salsbury, (ii) acquiring certain derogatory information about Dr. Beverly which, if revealed at trial, would make the defense more difficult, and (iii) Ms. Evans's willingness to settle for that amount prior to trial in the Circuit Court.

This action initially went to trial before Judge Mitchell in December, 1990, but on the third day of trial the judge declared a mistrial after he concluded that an improper question addressed by Ms. Evans's attorney, Mr. Ellin, to an expert witness he had called injected an unfairness into

the case that could not be corrected by a curative instruction. We shall recite some of the details of that incident later.

A new trial commenced two months later, following which the jury returned a verdict in Ms. Evans's favor in the amount of $1,787,671. That amount represented the unpaid balance of the judgment against Dr. Beverly plus interest on that judgment and costs. Upon denial of appellant's post-trial motions, this appeal ensued, in which appellant asserts that:

 (1) the trial court erred in refusing to grant a second mistrial after plaintiff's counsel, in cross-examining a defense witness, injected into the case evidence regarding another incident in which appellant allegedly refused to settle a claim within policy limits and was successfully sued for acting in bad faith;

 (2) the court improperly determined that the measure of damages in the case was the uninsured (unpaid) part of the judgment against Dr. Beverly when the evidence indicated that there was no likelihood of a recovery of that excess from him; and

 (3) the assignment to Ms. Evans was against public policy and therefore was unenforceable.

Finding no reversible error, we shall affirm.

### Motion for Mistrial

To some extent, appellant's first argument has its roots in what occurred at the first trial. Mr. Ellin had called another lawyer, George White, Esq., as an expert witness, presumably to testify as to the value of Ms. Evans's claim and whether appellant's refusal to settle it within the policy limits constituted bad faith. In the midst of questioning Mr. White about his experience as a litigator generally and in evaluating and handling malpractice cases in particular, Mr. Ellin asked: "And, Mr. White, insofar as your experience is concerned regarding Medical Mutual Insurance Company, did you not so long ago sue Medical Mutual for bad faith involving the case of Walker Robinson?"

Upon objection and further inquiry outside the jury's presence, it was revealed that Mr. White had not sued the company for bad faith because he learned that there was sufficient insurance to cover the entire judgment he had won against the insured doctor. Judge Mitchell therefore found the question improper and further declared that the error could not be corrected—that "[t]he impression that has been given to the jury is that this Defendant before the Court at this moment has been sued on another occasion, asserting bad faith as the basis of the allegation," and that appellant would not have "an opportunity to fairly present its case." He therefore declared a mistrial.

On the ninth day of the second trial, appellant called as a witness Robert Phillips, who had been appellant's claims manager when the case against Dr. Beverly was filed. Mr. Phillips described the procedures used by appellant in evaluating claims and testified in particular to the handling of Ms. Evans's claim. He said that, after consulting with his staff and with two attorneys, he concluded that the case was defensible and that it did not call for an offer of policy limits. He concurred in a recommendation to offer what he called a "high-low" settlement, which, as best we understand it from what he said was that the case would go to trial and that the company would pay a minimum of $400,-000 and, to the extent the jury verdict warranted it, up to $1,000,000. Toward the end of his direct examination, he was asked his opinion of the claims representative who investigated the Evans claim, and he responded that she was very thorough and meticulous.

On cross-examination, Mr. Ellin brought out that he and Mr. Phillips had had a number of battles in the past. He then asked whether Phillips's testimony was "completely free of any bias or possible resentment or irritation toward me," to which Phillips responded in the affirmative. This colloquy then occurred:

"Q: Did I not, Mr. Phillips, many years ago, before the Beverly case, call you up involving a case where suit was brought, where you were the claims manager of a

young woman who claimed that her reproductive organs were removed over at Bon Secours Hospital without her permission, she was 28 years old, took out her ovaries, her uterus?

MR. LEVIN [Defense Counsel]: Objection.

MR. ELLIN: Your Honor, this—

THE COURT: Overruled.

Q: And a suit was filed and I called you up, sir, and you said what, asked me what was the demand, and I said the client has advised me she will accept $300,000, and was your response, sir, did you say $23,000? You remember that episode, don't you?

A: I remember the case. I don't remember the $23,000 figure.

Q: And, Mr. Phillips, the jury down the hall here—

MR. LEVIN: Objection.

THE COURT: Overruled.

Q: —returned a million four hundred thousand dollars, or more than four hundred thousand dollars more than the doctor's coverage. You remember that, don't you?

A: Yes, I did.

Q: And as it turned out, the claim that that doctor assigned to my client, the same thing that the doctor in this case assigned to Mrs. Evans, the right to sue, and you subsequently paid the additional money.

MR. LEVIN: Objection."

At that point, the court called a bench conference, informed Mr. Ellin that it assumed the purpose of the questions posed was to show bias on the part of the witness but expressed concern as to the relevance of what occurred in the other case. Ellin responded that

"for a jury to appreciate the potential bias that he would have to have toward me in a virtually identical situation to the incident, one might well explain why he is here today, and I submit it's properly before this jury with

regard to accepting or rejecting his testimony being free of bias."

Unimpressed, appellant's counsel asked for a mistrial, claiming that Mr. Ellin was attempting to do the same thing he had done in the earlier trial.

After some further examination of Mr. Phillips outside the jury's presence, upon which it was revealed that, although a suit was brought by Mr. Ellin in the earlier case, the matter was settled without any determination by a judge or jury that appellant had proceeded in bad faith, the court (1) found the injection of what occurred in the earlier case improper, (2) forbade Mr. Ellin from pursuing it further, and (3) offered to give a curative instruction, but (4) denied the motion for mistrial. Mr. Levin urged that a curative instruction would not suffice and pressed for a mistrial. The court again rejected that approach and instructed the jury to "assess the evidence in this case and determine the facts with regard to this case based on what has been presented to you as to this case." No objection was made with respect to that instruction.

■ Relying principally on *Martens Chevrolet v. Seney,* 292 Md. 328, 439 A.2d 534 (1982), appellant continues to urge that the injection of what occurred in the earlier case—alleged prior misconduct not resulting in a conviction—was wholly inappropriate, terribly prejudicial, and warranted a mistrial. We agree that the questioning about the other case was improper and prejudicial. Mr. Ellin is an experienced litigator and should have known better. If he wanted to show that Mr. Phillips was biased or held some grudge against him, he could have inquired into that without revealing the particular facts of the earlier case—the offer of $23,000 for the loss of a young woman's reproductive organs.[1] He could simply have asked whether, in an earlier case, he had caused appellant to pay an amount in

---

1. Although this is not noted in the record extract, we were advised at oral argument, without contradiction, that there were several women of childbearing age on the jury.

excess of its policy limits based on a charge that Phillips had refused to settle the underlying claim within the policy limits and whether that episode had any influence on Phillips's testimony in the present case. There simply was no need to get into the nature of the earlier claim; it had no relevance whatever and, patently, was injected not to show bias but rather to show prior bad conduct on appellant's part.

The *Martens Chevrolet* Court made clear that that kind of evidence—prior bad conduct not resulting in a conviction (or even a civil judgment)—is inadmissible to impeach general credibility. That does not mean, however, as appellant contends, that the only remedy for the injection of such evidence is a mistrial. In *Martens Chevrolet*, the Court simply said that the admission of such evidence, if uncorrected by the court, constitutes reversible error, and indeed it does. The court clearly did err here by overruling Mr. Levin's initial objections to the line of questioning, but, upon the final objection, after the thrust of the inquiry became more clear, it seemed to recognize the error and took steps to correct it. That did not occur in *Martens Chevrolet*. The issue is whether the steps taken were sufficient or, conversely, whether the error was so egregious that a mistrial was required as a matter of law.

In *Kelch v. Mass Transit Adm.*, 42 Md.App. 291, 297, 400 A.2d 440 (1979), *aff'd*, 287 Md. 223, 411 A.2d 449, we restated the general rule that:

> "The decision to grant or to deny a mistrial rests in the sound discretion of the trial judge, and in the absence of proof of abuse of that discretion his decision will not be disturbed on appeal. Generally, the choice of measures to protect the fair, unprejudiced workings of the trial court's proceedings is left to the discretion of the court, and only in exceptional cases will its choice be reviewed by the appellate courts."

*See also Brooks v. Daley*, 242 Md. 185, 218 A.2d 184 (1966).

Judge Mitchell had the benefit of being able to gauge, far better than we can, the extent of the prejudice

caused by Mr. Ellin's questions and Mr. Phillips's responses. This occurred, as we said, on the ninth day of the second trial in this matter. A great deal of evidence had already been presented, and the relatively brief colloquy complained of here has to be viewed in context of all that had previously occurred. On this record, we cannot properly conclude that Judge Mitchell's opting for a curative instruction over a mistrial constitutes an abuse of discretion. We do, however, condemn the provocation that caused the problem.

### Measure of Damages

Relying on a number of out-of-State cases and giving but the faintest recognition to a line of Maryland cases, appellant contends that the court should have limited Ms. Evans's damages to what she could have collected from Dr. Beverly, and that, as she failed to present any evidence of what that amount was, appellant was entitled to judgment. We find no merit in its argument. Nor do we find merit in the alternative argument that the measure of damages in this action is controlled by the "cap" on non-economic loss imposed by Md.Code, Cts. & Jud.Proc. art., § 11–108.

■ The first argument is based on the notion that, had Dr. Beverly been the plaintiff, he could collect on a bad faith claim only what he was forced to pay on the judgment entered against him, and that, as his assignee, Ms. Evans is entitled to no more. For the most part, the foreign cases relied on by appellant do not really stand for that proposition, although one or two do so hold. More important, however, the Maryland appellate courts have taken a very different view and have held that the proper measure of damages in actions based on a bad faith refusal to compromise pending tort claims within policy limits is the difference between the policy limit and the judgment rendered, i.e., the excess of the judgment over the policy limit.

The Court of Appeals first addressed this kind of action in *Sweeten, Adm'r. v. Nat'l. Mutual,* 233 Md. 52, 194 A.2d 817 (1963). The estate of an insured sued the defendant

insurer, complaining that the insurer had negligently and in bad faith failed to settle a tort claim against the insured within the $10,000 policy limit, and that, as a result, a judgment was rendered against the insured for $19,000. The suit sought recovery of the $9,000 difference between policy limits and the judgment. The trial court dismissed the action on demurrer on the ground that, in the absence of any allegation that the insured or the estate had paid any part of the judgment, no damage was alleged. The Court of Appeals reversed, following what it regarded as "the great weight of authority" and concluding that the mere existence of the unpaid judgment constituted injury. Actual payment by the insured, in other words, was not a prerequisite to the action.

The Court expounded on the nature of this kind of action in greater detail in *State Farm v. White*, 248 Md. 324, 236 A.2d 269 (1967). There, as in *Sweeten*, an insured sued his insurer for the difference between the tort judgment entered against him and the policy limit, and a judgment in that amount was rendered in the Circuit Court.[2] That judgment was affirmed on appeal. More recently, in *State Farm v. Schlossberg*, 82 Md.App. 45, 64, 570 A.2d 328 (1990), citing *Sweeten* and *State Farm*, we held directly that "[t]he measure of damages in this case is the difference between the judgment and policies' limits, plus interest and costs." *See also Lee v. Nationwide Mutual Insurance Company*, 286 F.2d 295 (4th Cir.1961), applying Maryland law and anticipating *Sweeten* and *State Farm*. To suggest, as appellant does, that the Maryland law on this point is in doubt is just not accurate.

 Nor is there even a scintilla of merit to the argument that the damages in this kind of action are governed in any

---

2. That the damage award represented the excess of the underlying judgment, plus interest and costs, over the policy limit is not apparent from the Court's Opinion but is made clear in the briefs filed in the case. *See* appellant's brief in *State Farm Mutual Automobile Insurance Company v. Marion E. White*, September Term, 1966, No. 678.

way by the $350,000 limit imposed by the General Assembly on non-economic loss in personal injury actions. While an action against an insurer for failing to exercise good faith in handling a claim is regarded as tort-based rather than contractual in nature, it is *not* an action for personal injury but is one to recover for the purely economic loss occasioned by the excess judgment.

### The Assignment

Appellant launches a multi-pronged attack on the assignment of Dr. Beverly's claim to Ms. Evans. It claims that the assignment is "purely and simply a collusive arrangement devoid of any regard for applicable ethical dictates and with the limited goal of maximizing the purely private stakes of the individuals privy to the deal," that it "promoted the potential for piece-meal protracted litigation," that it fostered collusion and criminal conduct, that it provided "an improper and excessive $50,000 fee to Mr. Salsbury contingent upon successful pursuit by Mrs. Evans of the bad faith claim," and that it rewarded Dr. Beverly, despite his culpability, with a contingent interest in the outcome of the assigned claim—an interest appellant refers to as a "kickback." All of this proceeds from the *a priori* averment that Maryland law has not to this point recognized assignments of this type.

It is true that the Maryland appellate courts have yet to consider whether the assignment of a claim of this kind—an action by an insured against his insurer based on a failure to exercise good faith to settle an underlying claim—is unenforceable on public policy grounds. Other courts around the country have considered the question, and most of them have concluded that assignments of this type are valid. Some base that conclusion on the premise that the claim is contractual in nature, i.e., the failure of the insurer to use good faith to settle a claim within policy limits represents a breach of its contractual obligation to its insured, and that contract claims are freely assignable. *See, for example, Glenn v. Fleming,* 247 Kan. 296, 799

P.2d 79 (1990); *Gray v. Nationwide Mutual Insurance Company,* 422 Pa. 500, 223 A.2d 8 (1966). Others, though regarding the action (either generally or as pled) as sounding in tort rather than contract, consider it assignable because it is the kind of tort action that survives the death of the insured. *See Olmstead v. Allstate Insurance Company,* 320 F.Supp. 1076 (D.Col.1971); *Jolly v. General Accident Group,* 382 F.Supp. 265 (D.S.C.1974). A California court, though noting the survivability of the action, seemed to uphold its assignability also on the ground that it is not in the nature of a wrong "of a purely personal nature." *Brown v. Guarantee Ins. Co.,* 155 Cal.App.2d 679, 319 P.2d 69 (1957).

It is clear from *Sweeten, supra,* 233 Md. 52, 55, 194 A.2d 52 and *State Farm v. White, supra,* 248 Md. 324, 329, 236 A.2d 269, that the action in Maryland is regarded as tort-based rather than contractual, even though it arises from the insurance contract. In *Hernandez v. Suburban Hosp.,* 319 Md. 226, 234, 572 A.2d 144 (1990), the Court, quoting from *Unkle v. Unkle,* 305 Md. 587, 505 A.2d 849 (1986) and *Summers v. Freishtat,* 274 Md. 404, 335 A.2d 89 (1975), observed that "[a]n unliquidated tort claim for money damages for personal injuries is encompassed within the definition of a chose in action" and that "a chose in action in tort is generally assignable, in the absence of a statutory prohibition, if it is a right which would survive the assignor and could be enforced by his personal representative." As *Sweeten* confirms, an action of this type, whether based on negligence or bad faith, survives the death of the insured.

These cases clearly provide a basis for concluding that this kind of action is assignable. Because the *Hernandez* Court did discuss the public policy implications of assignments of unliquidated tort actions (though only those of a personal injury nature), and because those considerations are raised by appellant, we shall address them.

■ A number of courts have considered the kind of public policy argument raised by appellant, and most have

not only rejected them but found positive benefits from allowing claims of this kind to be assigned, at least to the injured plaintiff, which is what we have here. The best exposition of this came in *Liberty Mutual Insurance Company v. Davis*, 412 F.2d 475, 485 (5th Cir.1969), where Judge Wisdom opined:

"There are strong policy considerations in favor of approving assignment of failure-to-settle claims to the injured claimant. A holding to the contrary would leave many judgment creditors without recourse. The claimant awarded damages may be left with a judgment-proof debtor whose only valuable asset is his cause of action against his insurer. It is unlikely that such an insured would undertake a complex and expensive suit against the insurer offering him no direct benefits. This would leave the injured party without recourse for his damages and would allow insurance companies to play fast and loose with claims against their less affluent policyholders."

*See also Gray v. Nationwide Mutual Insurance Company, supra,* 223 A.2d at 12–13, where the Pennsylvania court addressed and dismissed the argument that the allowance of assignments of these claims would foster fraud and collusion between insureds and claimants. Where, as here, the assignment itself does not relieve the insured of his liability to the claimant, the interests of the parties are unaffected by the assignment, for, as the *Gray* Court observed, at 13: "Whether the action would be brought in the name of the policyholder or in the name of the assignee, the policy-holder would be intent upon relieving himself of the excess judgment, and the assignee would be seeking to secure the balance due him."

Where the assignment is to the judgment creditor, there is little risk of the unwholesome trafficking in tort claims, for the parties, despite their previous adverse positions, have a common interest in obtaining a recovery from the insurer whose bad faith conduct caused the problem to exist. Assignments to others may well call for some public

policy constraints, but that is not an issue we need to deal with here.

As to the so-called "kick-back" argument, we observe that (1) because Ms. Evans did not purport to settle Dr. Beverly's retained claim but simply litigated her own, there was no direct "kick-back" to him, (2) as the assignment was of a valuable right, there is no reason why a contingent payment to Dr. Beverly's lawyer, in satisfaction of fees incurred by Dr. Beverly in defending his interest in the underlying malpractice action, could not be exacted as partial consideration for the assignment, and (3) in light of Dr. Beverly's omission to prosecute his retained claim for personal injury, the problem of splitting claims does not exist here.

For all of these reasons, we find no impediment to the enforcement of the assignment in question here.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.