23 A.3d 192

Justin Ray HANNAH

v.

STATE of Maryland.

No. 151, Sept. Term, 2009.

Court of Appeals of Maryland.

June 29, 2011.

Michael R. Braudes, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Harford County, a jury convicted Justin Ray Hannah, Petitioner, of the attempted murder of his former girlfriend's new boyfriend. The State's evidence was sufficient to establish that he committed this offense in the early morning hours of April 15, 2007. After Petitioner's conviction was affirmed by the Court of Special Appeals in an unreported opinion, he filed a petition for a writ of certiorari in which he presented this Court with two questions:

1. In a prosecution for attempted murder, did the admission of defense evidence that [Petitioner] did not own or have access to a gun justify the admission into evidence

of "rap" lyrics and associated drawings produced by [Petitioner] two years before the offense which dealt with guns and violence?

2. Did the trial court err in excluding evidence that a key State's witness had an ulterior motive to implicate the [Petitioner]?

We granted the petition. 411 Md. 740, 985 A.2d 538 (2009). For the reasons that follow, we hold that the Circuit Court erred in permitting the prosecutor to cross-examine Petitioner about ten "rap" lyrics that he had written. As we are not persuaded beyond a reasonable doubt that this error was harmless, we shall reverse the judgment of the Court of Special Appeals, and direct that the case be remanded for a new trial.

## Background

Petitioner's former girlfriend testified as follows. She ended her relationship with Petitioner in early April of 2007. On the evening of April 14, 2007, while she was at the home of her new boyfriend, she received several telephone calls from Petitioner,[1] who told her that he wanted to meet her new boyfriend. She and her new boyfriend agreed to meet Petitioner in the parking lot of a church on Cedar Church Road.

She and her new boyfriend arrived at that location about 3:00 a.m. on April 15th in a truck belonging to her new boyfriend's father. When they arrived, she received a phone call from Petitioner, who asked her if her new boyfriend was in the truck. When she answered yes to this question, Petitioner drove by the parking lot in his Ford Escort. Although she recognized Petitioner and his vehicle, and was able to see that there was a second person in Petitioner's vehicle, she was unable to identify that person. At this point, Petitioner rolled down the driver's side window, and either he or the other person in the Escort fired three shots at her and her

---

1. Verizon telephone records show that Petitioner called her about 50 times that night, and that she called Petitioner about 15 times.

new boyfriend. Fortunately, neither she nor her new boy-friend was injured.

Immediately after the shooting, she and her new boyfriend returned to his home and called the police. After the police arrived at that location, she received a telephone call from Petitioner. She put the call on speaker-phone so the officers could hear the conversation. Although she was able to identi-fy Petitioner as the caller, she could not remember what Petitioner said. The State's case included testimony that during this phone call, the caller said words to the effect that, "Your boy's done, this is finished, that is why we popped shots."

Petitioner testified that he arrived at his home at 12:07 a.m. on April 15, 2007 and never left until the next morning. He acknowledged that he and his former girlfriend had several telephone conversations on the night of April 14, 2007, but the only reason why he called her was to "explain to her that [he] wasn't messing around with other females[.]"

The following transpired during Petitioner's direct examina-tion:

[PETITIONER'S ATTORNEY]: Did you ever possess a handgun?

[PETITIONER]: No, sir.

[PETITIONER'S ATTORNEY]: Did you ever hold one in your hand?

[PETITIONER]: No, sir.

[PETITIONER'S ATTORNEY]: Did you ever fire one?

[PETITIONER]: No, sir.

[PETITIONER'S ATTORNEY]: Does your stepfather, [ ], own a gun?

[PETITIONER]: Not to my knowledge.

[PETITIONER'S ATTORNEY]: Do any of your buddies have a gun?

[PETITIONER]: No.

[PETITIONER'S ATTORNEY]: Did you ever have access to a gun? In other words, on April 15th or 14th, if you

wanted to put your hand on one for some reason, did you know anyone that you could get one from?

[PETITIONER]: No, sir.

[PETITIONER'S ATTORNEY]: So, if you wanted to get one, what would you do?

[PETITIONER]: I wouldn't know what to do. Like I don't live in an area where guns are heavy around. I don't know anybody that possesses any firearms.

[PETITIONER'S ATTORNEY]: Do you know the difference between a revolver and an automatic?

[PETITIONER]: I know they are handguns.

[PETITIONER'S ATTORNEY]: Is there any difference between the two?

[PETITIONER]: I believe they are both handguns.

The following transpired during Petitioner's cross-examination:

[STATE'S ATTORNEY]: You told the ladies and gentlemen of the jury that you do not possess a gun?

[PETITIONER]: No, ma'am.

[STATE'S ATTORNEY]: You never held a gun?

[PETITIONER]: No, ma'am.

[STATE'S ATTORNEY]: You never fired a gun?

[PETITIONER]: That's correct.

[STATE'S ATTORNEY]: But you do have an interest in guns, don't you?

[PETITIONER]: Do what?

[STATE'S ATTORNEY]: But you do have an interest in guns, don't you?

[PETITIONER]: Like what do you mean by interest?

[STATE'S ATTORNEY]: You are interested in them.

[PETITIONER]: No, ma'am.

[STATE'S ATTORNEY]: Not at all?

[PETITIONER]: I don't have an interest in guns.

[STATE'S ATTORNEY]: Did you ever write about guns?

[PETITIONER]: I have wrote raps, like freestyles about them. Like not about them, but had been incorporated.

[STATE'S ATTORNEY]: Your Honor, may counsel approach?

THE COURT: Sure.

(WHEREUPON, COUNSEL APPROACHED AND THE FOLLOWING ENSUED.)

[STATE'S ATTORNEY]: Again, giving notice of where I intend to go with Mr. Hannah, he has said that he has no interest in guns. I intend to show him a copy or the original of his composition book which was recovered from his bedroom which has rap lyrics of driveby shootings and people going pop, pop, pop and the burners, which I believe is another word for gun, is under the seat and finishing off with artwork of a semi-automatic nine millimeter.

THE COURT: Okay.

[PETITIONER'S ATTORNEY]: I think if he ever possessed a gun or was seen in possession of a gun it is relevant. How old are these? What is the date?

[STATE'S ATTORNEY]: His homework in the composition book is dated 2005. However, this was recovered from the top of his bar area in his bedroom. So, it is not as though it was found in the far depths of a box in the closet.

[PETITIONER'S ATTORNEY]: I think it is a balancing test, Your Honor, and I would say that this is not relevant to the issues in this case. The fact that he writes music— some you ever [sic] our greatest composers write music that has certain aspects to it. That doesn't mean that they believe in homicides or anything of that sort. I don't think there is any probative value to this. She asked if he is interested in guns and he says no. So, the fact that he wrote a rap thing two years ago—

[STATE'S ATTORNEY]: The raps aren't dated.

THE COURT: Plus there is a drawing. Overruled.

(WHEREUPON, COUNSEL RETURNED TO THE TRIAL TABLE AND THE FOLLOWING ENSUED.)

\* \* \*

[STATE'S ATTORNEY]: Mr. Hannah, you told the ladies and gentlemen of the jury that you do not have an interest in guns. Correct?

[PETITIONER]: No, ma'am. I said I wrote about them in raps I had written.

[STATE'S ATTORNEY]: How about explaining this to the jury.

[PETITIONER]: That was a picture of a tattoo that I was drawing for a kid and that was back when I was in the ninth or tenth grade in '05.

[STATE'S ATTORNEY]: Semi-automatic nine millimeter?

[PETITIONER]: Yes, ma'am.

[STATE'S ATTORNEY]: That's lyrics. You write about guns. Is that right?

[PETITIONER]: I'm saying I'm sure it's in there. Some of the best composers have written about guns and they haven't been tooken to court about it.

**[STATE'S ATTORNEY]: I'm not asking whether people should be prosecuted for writing about guns. I'm asking whether you wrote about guns.**

[PETITIONER]: Yeah.

**[STATE'S ATTORNEY]: One, two three, shot ya ass just got drop. One of your lyrics?**

[PETITIONER]: I guess so.

**[STATE'S ATTORNEY]: I ain't got guns, got a duz unda da seat. Your lyrics?**

[PETITIONER]: It's on the same paper.

[STATE'S ATTORNEY]: So, is that a yes?

[PETITIONER]: Yes, ma'am.

**[STATE'S ATTORNEY]: Ya see da tinted cum down n out come da glock. Your lyrics?**

[PETITIONER]: Yes, ma'am.

[STATE'S ATTORNEY]: What is a glock?

[PETITIONER]: I can't say. I know it's a handgun.

**[STATE'S ATTORNEY]: Ya just got jacked, we leave da scene in da lime green. Your lyrics?**

[PETITIONER]: Yes, ma'am.

**[STATE'S ATTORNEY]: So you betta step ta me before I blow you off ya feet. Your lyrics?**

[PETITIONER]: Yes. They're the same—that's a piece of paper. I assume it's in the same book, I guess.

**[STATE'S ATTORNEY]: Bring da whole click, we put em permanently sleep. Your lyrics?**

[PETITIONER]: Yes, it's on the same paper.

**[STATE'S ATTORNEY]: Wa you think, I ain't got burners, got a duz unda da seat. Your lyrics?**

[PETITIONER]: It's on the same paper, yes.

[STATE'S ATTORNEY]: What are burners?

[PETITIONER]: I can't reply. I heard that terminology in a rap song.

**[STATE'S ATTORNEY]: Let's see. Ya talk a bunch shit n ya sure—I can't read this. So pull your fuckin trigga nigga go pop, pop, one, two three shot ya ass jus got drop. Your lyrics?**

[PETITIONER]: Yes. It's on the same paper.

**[STATE'S ATTORNEY]: I'll put you in a funeral. Your lyrics?**

[PETITIONER]: It's on the same paper.

[STATE'S ATTORNEY]: Your lyrics and your artwork, Mr. Hannah. Yet you have no interest in guns?

[PETITIONER]: That's correct.

(Emphasis supplied).

Petitioner also presented witnesses who testified that his former girlfriend had told them that Petitioner was not involved in the shooting, but that—because her mother was pressuring her to do so, or "go back to rehab"—she would continue to claim that Petitioner was the shooter.

## Discussion

### I.

 Although it has often been stated that the "abuse of discretion" standard of review is applicable to the issue of whether the trial court failed to impose reasonable limits on cross-examination, the trial court does not have discretion to permit cross-examination that is harassing, unfairly prejudicial, confusing, or unduly repetitive. *Marshall v. State*, 346 Md. 186, 193, 695 A.2d 184, 187 (1997). In *King v. State*, 407 Md. 682, 967 A.2d 790 (2009), this Court stated:

> "Evidence is prejudicial when it tends to have some adverse effect ... beyond tending to prove the fact or issue that justified its admission...." *State v. Askew*, 245 Conn. 351, 362, 716 A.2d 36, 42 (1998) (citation omitted). If the relevant witness is the defendant, the risk of unfair prejudice to her or him is high because " 'the jury may improperly infer that [she or he] has a history of criminal activity and therefore is not entitled to a favorable verdict.' " *Jackson*, 340 Md. at 715, 668 A.2d at 13 (quoting *Ricketts*, 291 Md. at 703, 436 A.2d at 908). Stated otherwise, the jury may feel that " 'if the defendant is wrongfully found guilty[,] no real harm is done.' " *Id.* (quoting *Ricketts* [*v. State* ], 291 Md. [701] at 703, 436 A.2d [906] at 908 [ (1981) ]); *see also* [*State v.*] *Westpoint*, 404 Md. [455] at 479, 947 A.2d [519] at 534 [ (2008) ] (quoting same). For a defendant wishing to tell her or his story to the jury, this translates to a very real prejudice: the defendant may be forced to choose between testifying in her or his own defense with the risk of being convicted by the jury's misuse of impeachment evidence as propensity evidence, on one hand, and not testifying and foregoing a defense, on the other. *See Westpoint*, 404 Md. at 479, 947 A.2d at 534; *Jackson* [*v. State* ], 340 Md. [705] at 715, 668 A.2d [8] at 13 [ (1995) ].

*Id.* at 704, 967 A.2d at 803. In the case at bar, the Circuit Court abused its discretion by permitting the State to cross-examine Petitioner about each and every one of the ten violent "rap" lyrics that Petitioner had written.

Most appellate courts that have reviewed rulings admitting words written by the criminal defendant have distinguished admissible statements of historical fact from inadmissible works of fiction.[2] For example, in *Bryant v. State*, 802 N.E.2d 486 (Ind.Ct.App.2004), while affirming a murder conviction, the Indiana Court of Appeals rejected the appellant's argument that he was unfairly prejudiced by the introduction into evidence of two rap song lyrics that he had either composed or plagiarized. Each song included the words "Cuz the 5–0 won't even know who you are when they pull yo ugly ass out the trunk of my car."

> Inasmuch as [the victim's] body was recovered from the trunk of her car, and Bryant had driven that vehicle for several days visiting friends and telling them that he was the owner, the reference in the exhibits to finding a body in the trunk of "my car" made it more probable that Bryant killed [the victim] and placed her body in the trunk. Thus, such evidence was relevant, and the trial court did not abuse its discretion in admitting the exhibits on this basis.

802 N.E.2d at 498.

In *Greene v. Commonwealth*, 197 S.W.3d 76 (Ky.2006), while affirming the conviction of a defendant who had been found guilty of murdering his wife, the Supreme Court of Kentucky held that the defendant had not been unfairly prejudiced by the introduction of a 7 minute "video montage" in which, while "rapping with his friends," the defendant said:

> . "B - - made me mad, and I had to take her life. My name is Dennis Greene and I ain't got no f- -ing wife."
> . "I knew I was gonna be givin' it to her ... when I got home ..."
> . "I cut her motherf- -in' neck with a sword ..."
> . "I'm sittin' in the cell starin' at four walls ..."

The *Greene* Court stated:

---

**2.** For an instructive analysis of cases involving "rap" lyrics, see Andrea L. Dennis, *Poetic (In) Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence,* 31 Colum. J.L. & Arts, 1 (2007).

Appellant contends that the rap video is simply character evidence introduced to prove a "criminal disposition." *Billings* [*v. Commonwealth of Kentucky* ], 843 S.W.2d [890] at 892 [ (Ky.1992) ]. Appellant, however, misapplies the character evidence standard. Evidence of prior arrests, convictions, or bad acts is excluded not because they are not relevant, but rather, because the probative value of the character evidence is substantially outweighed by the prejudicial effect. Here, that is not the case because (a) the video refers to Appellant's actions and emotions regarding this crime, not a previous offense, (b) the video sheds light on Appellant's EED defense by illuminating his mental state shortly after the killing, and (c) the video establishes premeditation and motive in Appellant's own words. For the foregoing reasons, we affirm the trial court's admission of the rap video montage.

197 S.W.3d. at 87.

The case at bar, in which there is no evidence that Petitioner's lyrics are autobiographical statements of historical fact, is more analogous to the cases of *State v. Cheeseboro*, 346 S.C. 526, 552 S.E.2d 300 (2001), and *State v. Hanson*, 46 Wash.App. 656, 731 P.2d 1140 (1987). In *Cheeseboro*, the Supreme Court of South Carolina affirmed the convictions of a defendant found guilty by a jury of armed robbery, shooting three victims, killing two, kidnapping the third, and assault and battery with intent to kill. *Id.* at 304. In that case, prior to trial, prison officials seized from the defendant's cell the following rap lyrics that the defendant had written:

Ruckus, I believe you're a perpetrator, gold and platinum hater, cause me and J.D. is a force like Dark Vador. Who do you despise a strong enterprise? Do the greed in your eyes lead you to tell lies? Victimize me and Jermain Dupri, don't let me see or else there'll be death in this industry. Want let go, set it fo' sho', I get hype like Mike put yo' blood on the dance flo'. Blow fo' blow, toe to toe, with that no mo'. Like the 4th of July, I spray fire in the sky. If I hear your voice, better run like horses or like metamorphis, turn all y'all to corpses. No fingerprints or evidence at

your residence. Fools leave clues, all I leave is a blood pool. Ten murder cases, why the sad faces? Cause when I skipped town, I left a trail [of] bodies on the ground. Your whole click ain't nothing but tricks, bitch pulling sticks, grown men sucking dicks. No one bring ruckus like King Justice, but toughest the So So Def most corruptest.

*Id.* at 312.

Noting the defendant's references to leaving bodies in a pool of blood without leaving fingerprints, the trial judge admitted these lyrics as an admission by the defendant that he had committed the acts described in the lyrics. While holding that the lyrics were inadmissible, the Supreme Court of South Carolina stated:

We find these references too vague in context to support the admission of this evidence. The minimal probative value of this document is far outweighed by its unfair prejudicial impact as evidence of appellant's bad character, *i.e.* his propensity for violence in general ... [T]hese lyrics contain only general references glorifying violence. Accordingly, the Ruckus song should have been excluded.

*Id.* at 313. The *Cheeseboro* Court also held that, because the prosecution had presented overwhelming evidence of the defendant's guilt—including two letters written by the defendant in which he expressed his intent to commit the crimes for which he was ultimately charged, "there is no reversible error." *Id.*

In *Hanson,* while reversing a first degree assault conviction on the ground that the State's cross-examination of appellant about his fictional writings that contained incidents of violence was "highly prejudicial," the Court of Appeals of Washington stated:

Assuming arguendo that the defendant placed his character for nonviolence in issue during his direct testimony, we hold that his writings were irrelevant to rebut this character evidence. Without some further foundation, the defendant's writings were simply not probative. A writer of crime

fiction, for example, can hardly be said to have displayed criminal propensities through works he or she has authored. *Id.* at 1144. In a footnote following "further foundation," the *Hanson* Court stated:

There may be instances when a defendant's fictional writings would be admissible. . . . In this case, the State never indicated how the defendant's writings were logically relevant under ER 404(b). There was no attempt to show, for example, that Hanson wrote about an incident so similar to the crime charged that his writings were relevant to the question of identity.

*Id.* n. 7.

*Hanson* was cited with approval by the United States Court of Appeals for the Seventh Circuit in *United States v. Foster*, 939 F.2d 445 (7th Cir.1991), which involved the issue of whether the appellant, who had been convicted by a jury of possession with intent to distribute cocaine and PCP, had been unfairly prejudiced by the introduction of the portion of a notebook seized from his person that contained the following handwritten verse:

Key for Key, Pound for pound I'm the biggest Dope Dealer and I serve all over town. Rock 4 Rock Self 4 Self. Give me a key let me go to work more Dollars than your average bussiness [sic] man.

In *Foster*, the appellant was arrested after he entered Chicago's Union Station carrying suitcases that contained the drugs he was convicted of possessing. Between the time that he was approached by DEA agents and the time of his arrest, the appellant "disclaimed any ownership of the suitcases, telling the agents that he had agreed to carry them from the train to the baggage claim area as a favor to a young black male." *Id.* at 449. Under these circumstances, the federal district court (1) ruled that the verse was admissible evidence of the appellant's knowledge and intent, and (2) gave the following limiting instruction:

The document is received for a limited purpose. It is not received to establish that the defendant is, in fact, the

biggest dope dealer. It is not received that the defendant makes more dollars than the average businessman. It is not received for that purpose. It is received for a limited purpose.

The admissibility of evidence of other acts or crimes is governed by Rule 404(b) of the Federal Rules of Evidence, which provides that such evidence may not be used to prove a person's bad character or his propensity to commit crimes in conformity with that character, but may be used for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge or absence of mistake or accident. The limited purpose for which the document is received is only as to evidence of knowledge and intent. The defendant is accused in the indictment of having knowledge and intention; that he knowingly and intentionally did something.

*Id.* at 455.

The *Foster* Court stated:

If nothing else, *Hanson* underscores the need to recall that the rap verse was not admitted to show that Foster was, in fact, "the biggest dope dealer"; it was not admitted to establish that Foster was the character portrayed in the lyrics. But in writing about this "fictional" character, Foster exhibited knowledge of an activity that is far from fictional. He exhibited some knowledge of narcotics trafficking, and in particular drug code words. It was for this limited purpose that the verse was admitted, and it is for this limited purpose that its relevance is clear. *Compare Monzon*, 869 F.2d at 344–45 (certain evidence indicating "use of controlled substances"—i.e., that defendant had marijuana butts in his car and that he sported a long pinky fingernail—held inadmissible to establish intent to distribute cocaine).

Much of Foster's argument on this point is therefore of limited usefulness because, to answer his concerns by the same type of analogy, admitting the rap verse was not the equivalent of admitting *The Godfather* as evidence that Mario Puzo was a mafia don or admitting "The Pit and the

Pendulum" as evidence that Edgar Allen Poe had tortured someone. It was, instead, the equivalent of admitting *The Godfather* to illustrate Puzo's knowledge of the inner workings of an organized crime family and admitting "The Pit and the Pendulum" to illustrate Poe's knowledge of medieval torture devices. Rap music, under Foster's definition, "constitutes a popular musical style that describes urban life"; it describes the reality around its author. And it is Foster's knowledge of this reality, as evidenced by the verse that he has admittedly authored, that was relevant to the crimes for which he was charged.

939 F.2d at 456.

The *Hanson* Court also noted that evidence offered by the defense may "open the door" to the introduction of otherwise inadmissible evidence of a defendant's writings. The *Hanson* opinion includes a discussion of *United States v. Giese,* 597 F.2d 1170 (9th Cir.1979), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979), in which, while affirming convictions for conspiracy to bomb military recruiting centers, a divided panel of the United States Court of Appeals for the Ninth Circuit held that the defendant's direct examination opened the door to cross-examination about the contents of *From the Movement Toward Revolution,* a book that the defendant admitted having read. The majority opinion, in pertinent part, stated:

Giese claims the trial judge committed three separate errors in permitting the government to use a book entitled From the Movement Toward Revolution as evidence against him.

* * *

We reject Giese's arguments, but in so doing we wish to emphasize that we are not establishing a general rule that the government may use a person's reading habits, literary tastes, or political views as evidence against him in a criminal prosecution. In many cases such evidence would be clearly inadmissible. *See, e.g., United States v. McCrea,* 583 F.2d 1083 (9th Cir.1978). Our decision upholding the admissibility of From the Movement Toward Revolution

stems from the peculiar circumstances of this case and, reflecting our concern for the sensitive nature of First Amendment values, it rests on very narrow grounds. We hold that it was proper to introduce the book during the government's case-in-chief because it bore the fingerprints of Giese and three of his co-conspirators and thus tended to corroborate witnesses' testimony that the conspirators associated with each other. We further hold that it was proper to ask Giese to read extracts from the book on cross-examination because he opened the door to that line of inquiry by introducing 18 books as evidence of his peaceable character during his own testimony on direct examination.

\* \* \*

Giese took the stand in his own behalf and denied supplying his alleged confederates with From the Movement Toward Revolution and the various explosives and firearms manuals which had been found in their possession. [ ] Had he stopped his testimony about books at that point, he would not have opened any doors. But he did not stop. In response to his counsel's questions, Giese produced a stack of 18 books and proceeded to describe them one by one. [ ] All 18 were introduced into evidence later in the trial and were available for the jury's inspection. Some of the items were "representative samples" of the types of books Giese stocked in his bookstore; others, including three books Giese had written, were his personal property and had been kept at his home rather than at the bookstore.

\* \* \*

Giese's direct examination testimony about the 18 books filled almost six pages of the reporter's transcript.

\* \* \*

Giese implied that the 18 books exemplified the kind of literature he sold, owned, or read, and that the literature, in turn, reflected his left-wing but non-revolutionary political views. His testimony about the 18 books, unlike his statements denying that he had sold the books introduced by the prosecution, was more than just an attempt to explain away

government exhibits. The books were pieces in the overall mosaic of character evidence which Giese presented on direct examination.

\* \* \*

Justice would not have been served had the jurors been left with only the one-sided impressions created by Giese's 18 innocuous books. To show the opposite side of the coin, as it were, it was fair for the government to cross-examine Giese on other books he had sold, owned, or read. From the Movement Toward Revolution was such a book. It is true that Giese did not keep From the Movement Toward Revolution in stock at the bookstore, but he did not sell all of the 18 books there either. However, there is no doubt that Giese read and owned From the Movement Toward Revolution. In addition to handling and perhaps reading Severin's copy of the book, Giese possessed his own copy, portions of which he had read. Given Giese's fairly extensive contacts with the book, we hold that the court below did not abuse its discretion in permitting the prosecution to inquire about From the Movement Toward Revolution on cross-examination.

*United States v. Giese,* 597 F.2d 1170, 1184–1191 (9th Cir. 1979) (internal citations to the record and footnotes omitted).

Having applied the holdings of the above cited cases to the facts of the case at bar, we are persuaded that Petitioner was unfairly prejudiced by the above quoted cross-examination. Unlike *Giese,* Petitioner's direct examination did not open the door to the State's use of his writings. Unlike *Foster,* Petitioner's writings were not offered as evidence of his knowledge or intent. Like *Hanson* and *Cheeseboro,* Petitioner's writings were probative of no issue other than the issue of whether he has a propensity for violence.

▬ We agree with the *Cheeseboro* Court that the erroneous introduction of a defendant's writings is subject to a "harmless error" analysis. While the State's case against Petitioner was a strong one, unlike *Cheeseboro,* the State's case was not overwhelming. Our conclusion that the errone-

ous introduction of Petitioner's writings did not constitute "harmless error" is consistent with *Eiler v. State,* 63 Md.App. 439, 492 A.2d 1320 (1985), in which the Court of Special Appeals reversed a murder conviction on the ground that the appellant was unfairly prejudiced by cross-examination questions about racial slurs that he had uttered while testifying at his first trial on that charge. The *Eiler* Court, in an opinion authored by Chief Judge Bell—who was then serving on the Court of Special Appeals, stated:

> We find the line of questioning to have been prejudicial, irrelevant, and collateral. We can conceive no possible basis for it and the State does not suggest any. It had no tendency to prove any material issue in the case. The situation was exacerbated by the State unnecessarily prodding appellant to repeat his prior statements merely for the purpose of showing his racial prejudice.

*Id.* at 454, 492 A.2d at 1327.

Our conclusion is also consistent with *Medical Mutual v. Evans,* 330 Md. 1, 622 A.2d 103 (1993), *rev'g* 91 Md.App. 421, 604 A.2d 934 (1992), in which this Court ordered a new trial on the ground that the trial judge had erroneously admitted unfairly prejudicial details of "bias" impeachment evidence that were likely to arouse the jurors' passion. 330 Md. at 24, 622 A.2d at 114. *Evans* involved a "bad faith" (failure to settle) action in which the respondent's counsel cross-examined the insurance company's former claims manager about intimate and emotionally charged details of "a virtually identical situation" (a damage award in excess of the doctor's coverage; an assignment of the "excess" judgment; and a successful action against the insurance company). While affirming the judgment on the ground that the Circuit Court gave a limiting instruction to the jury, Chief Judge Wilner stated for the Court of Special Appeals:

> [W]e agree that the questioning about the other case was improper and prejudicial. [The former claims manager] could simply have asked whether, in an earlier case, he had caused appellant to pay an amount in excess of its policy limits based on a charge that [he] had refused to settle the

underlying claim within the policy limits and whether that episode had any influence on [his] testimony in the present case. There simply was no need to get into the nature of the earlier claim; it had no relevance whatever and, patently, was injected not to show bias but rather to show prior bad conduct on appellant's part.

91 Md.App. at 429, 604 A.2d at 938 (1992).

Chief Judge Wilner's analysis is fully applicable to the case at bar. Petitioner could simply have been (1) asked whether he had "knowledge" of guns, (2) shown his drawing of a handgun, and (3) asked whether he had written lyrics that "were about guns." Instead, the prosecutor's use of Petitioner's writings was unfairly prejudicial. It had no tendency to prove any issue other than the issue of whether Petitioner was a violent thug with a propensity to commit the crimes for which he was on trial. The situation was exacerbated by the State's emphasis upon Petitioner's lyrics, during a cross-examination in which he was unnecessarily prodded into conceding that he had written each of the violent lyrics. As the ten "Your lyrics?" questions served no purpose other than the purpose of showing that Petitioner has a propensity for violence, he is entitled to a new trial.

## II.

During the retrial, when determining the admissibility of evidence that is directed at proving that a State's witness has a motive to testify falsely, the Circuit Court shall apply *Calloway v. State,* 414 Md. 616, 996 A.2d 869 (2010) and *Martinez v. State,* 416 Md. 418, 7 A.3d 56 (2010).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS THAT IT BE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY HARFORD COUNTY.**

HARRELL, J., Concurs.

Concurring Opinion by HARRELL, J.

I agree with the Majority opinion that the State's multitudinous questioning as to *all* ten rap lyrics about guns and violence was more prejudicial than probative. I write separately because I wish to distance myself from any intimation by the Majority that rap lyrics generally are admissible only if they constitute an admission of guilt, or in the Majority opinion's words, an "autobiographical statement[ ] of historical fact. . . ." Majority op. at 349, 23 A.3d at 197. I disagree further with the Majority opinion's conclusion that, in the present case, the rap lyrics "had no tendency to prove any issue other than the issue of whether Petitioner was a violent thug with a propensity to commit the crimes for which he was on trial." Majority op. at 357, 23 A.3d at 202. As part of his defense to the charge of murder by handgun, Petitioner suggested on direct examination, and then stated outright in cross-examination, that he was a naif when it comes to knowledge of or interest in guns. Under well-established principles of federal and state evidence law, the State was entitled to use a portion of the now-relevant rap lyrics to (1) challenge that defense and to (2) attack the credibility of the witness, i.e., Petitioner, through impeachment.

With respect to the introduction of the rap lyrics for substantive rebuttal purposes, *Johnson v. State*, 408 Md. 204, 226, 969 A.2d 262, 275 (2009), states, "It is well settled that '[a]ny competent evidence which explains, or is a direct reply to, or a contradiction of, material evidence *introduced by the accused* may be produced by the prosecution in rebuttal.'" (Citing *Lane v. State*, 226 Md. 81, 90, 172 A.2d 400, 404 (1961)). Stated another way, "when the defense 'opened the door,' the prosecution is entitled to a fair response." *Lupfer v. State*, 420 Md. 111, 21 A.3d 1080 (2011) (2011) (Majority op. at 134, 23 A.3d at 1093–94).

With respect to the introduction of the lyrics for impeachment purposes, Maryland Rule 5–616(a)(1)–(3) states:

(a) The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:

(1) Proving under Rule 5–613 that the witness has made statements that are inconsistent with the witness's present testimony;

(2) Proving that the facts are not as testified to by the witness;

(3) Proving that an opinion expressed by the witness is not held by the witness or is otherwise not worthy of belief;

The only limitation on these rules is that evidence should be excluded where the danger of prejudice outweighs the probative nature of the testimony. *See Terry v. State,* 332 Md. 329, 334, 631 A.2d 424, 426 (1993). Therefore, the trial judge must strike a balance between the probative value and the prejudicial nature of a witness's testimony when determining admissibility. *See Ware v. State,* 348 Md. 19, 68, 702 A.2d 699, 723 (1997). It was in discharging this duty that, on this record, the trial judge erred.

In the present case, Petitioner testified to a lack of knowledge or interest in guns. He denied ever possessing, holding, or firing a gun. When his attorney asked on direct examination if he knew the difference between a revolver and an automatic, Petitioner testified, "I believe they are both handguns." During cross-examination, the following colloquy took place:

[State's Attorney]: You are interested in [guns?]

[Petitioner]: No, ma'am.

[State's Attorney]: Not at all?

[Petitioner]: I don't have an interest in guns.

[State's Attorney]: Did you ever write about guns?

[Petitioner]: I have wrote raps, like freestyles about them. Like not about them, but had been incorporated.

Following this testimony, the State's Attorney propounded a series of questions asking if Petitioner was the author of rap lyrics about guns and a detailed and realistic drawing of a 9mm pistol found in Petitioner's school notebook.

[State's Attorney]: One, two three, shot ya ass just got drop. One of your lyrics?

[Petitioner]: I guess so.

\* \* \*

[State's Attorney]: Ya see da tinted cum down n out come da glock. Your lyrics?

[Petitioner]: Yes, ma'am.

[State's Attorney]: What is a glock?

[Petitioner]: I can't say. I know it's a handgun.

[State's Attorney]: Ya just got jacked, we leave da scene in da lime green. Your lyrics?

[Petitioner]: Yes, ma'am.

[State's Attorney]: So you betta step ta me before I blow you off ya feet. Your lyrics?

[Petitioner] Yes. They're the same—that's a piece of paper. I assume it's in the same book, I guess.

Contrary to the Majority opinion's assertion, the State's Attorney's cross-examination had distinct probative value sounding in rebuttal and impeachment. Petitioner chose to assert, as part of his defense, that he had no knowledge of or interest in guns. The State was entitled to challenge this defense "through questions" and, in the process, "attack[ ]" the "credibility of a witness. . . ." Rule 5–616. In particular, the State was permitted to question Petitioner (to a reasonable extent) about his rap lyrics and artwork in response to Petitioner's ignorance defense. Regarding the credibility of the testifying witness, i.e., Petitioner, the rap lyrics: "[p]rov[ed]" (1) that "the witness['s previous statements] . . . are inconsistent with the witness's present testimony," Rule 5–616(a); (2) that "the facts are not as testified to by the witness," Rule 5–616(b); and (3) that "an opinion expressed by the witness is not held by the witness or is otherwise not worthy of belief. . . ." Rule 5–616(c).

Stated another way, Petitioner alleged that he could not have committed the murder because he knew bupkis[1] about

---

1. I believe that this is the Yiddish word for "nothing."

guns. His "original" rap lyrics and artwork demonstrated, however, that Petitioner was interested enough in guns to reference them repeatedly in musical lyrics, to know that the term "glock" is shorthand for a handgun (specifically, a "Glock Safe Action Pistol"), and to invest some time sketching a detailed picture of a 9mm handgun. The Maryland Rules authorize the use of such evidence because it is highly probative—it helps juries evaluate the strength of a chosen defense as well as the credibility of a testifying witness. Therefore, the Majority opinion, it seems to me, is too eager to declare that rap lyrics are only admissible (as more probative than prejudicial) where they constitute an admission of guilt. Moreover, the Majority opinion is incorrect that, in the present case, the rap lyrics served only to evince Petitioner's generally-violent nature. Thus, I am concerned that Bench and Bar may construe the Majority's sweeping conclusions to limit improperly the future use of rap lyrics in criminal proceedings.

Understandably, the appearance of rap lyrics in transcripts of criminal trials is a fairly recent development. Nevertheless, this Court should be unafraid to apply firmly-rooted canons of evidence law, which have well-protected the balance between probative value and prejudice in other modes of communication. Undoubtedly, rap lyrics often convey a less than truthful accounting of the violent or criminal character of the performing artist or composer. When the defendant, however, elects to put forward a defense of ignorance on the witness stand, the State is entitled to use previous statements, including rap lyrics, to challenge the substantive truth of the defense as well as the credibility of the testifying witness.[2] It is enough that a person states unequivocally a certain impor-

---

2. In the context of impeachment, we are not concerned, however, with the veracity of the impeaching statement. *See Ali v. State,* 314 Md. 295, 305, 550 A.2d 925, 930 (1988) ("[W]e conclude that the statements were admissible if offered solely for impeachment, i.e., to show that on a prior occasion the witness had uttered statements inconsistent with her present testimony. They were not, however, admissible if offered to prove the truth of the matter asserted in the statements.").

tant fact in defense at trial, but said something exactly contradictory out-of-court. That the contradicting statement is a rap lyric should not dictate the process or result of our analysis.

Most rap lyrics offered by the State likely will be prejudicial in some fashion to the defendant; the State would not offer them otherwise. There are certain circumstances, however, where the lyrics possess an inherent and overriding probative purpose. One circumstance would be where the lyrics constitute an admission of guilt, but others would include rebutting an offered defense and impeaching testimony. Although there is no definitive line that demarcates the amount or content of lyrics that may be used appropriately, reasonableness should govern. The distinction between whether rap lyrics are more probative than prejudicial is a determination for the trial judge in the first instance. This Court should not burden that decision with too broad limitations. Here, the prosecution went to the well too often and crossed the line into the overly prejudicial zone. A more discriminating use of selected lyrics and the drawing of the 9 mm handgun could have sufficed and survived appellate scrutiny, in my judgment.